Filed 6/17/20 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CLEM THOMPKINS et al.,<br><br>    Defendants and Appellants. | A141375<br><br>(Alameda County<br> Super. Ct. No. 168583A/B)<br><br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on May 1, 2020, be modified as follows:

1. On page 22, delete the sentence "A kill zone instruction was given in this case, apparently given at the court's own suggestion, as the prosecutor's request for jury instructions did not list CALIC No. 8.66.1." and insert the following sentence in its place:

   A kill zone instruction was given in this case, apparently at the court's own suggestion, as the prosecutor's request for jury instructions did not list CALJIC No. 8.66.1.

2. On page 32, line 10, after the sentence ending with "and the related enhancement findings" add the following new paragraphs:

   In a rehearing petition that for the first time acknowledges the legal inadequacy of the kill zone instruction under *Canizales* (a case which, to be sure, had yet to be decided when these

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.A.2, III.A.3, III.A.5, III.A.6, and III.B through III.F.

appeals were originally briefed), the Attorney General suggests that "[w]hen viewed in light of the facts of this case and the standard set forth in *Aledamat* and [*People v. Merritt* (2017) 2 Cal.5th 819 (*Merritt*)], the opinion in this case appears to set the bar too high" for affirmance.  According to the Attorney General, "[t]he test under those cases and the United States Supreme Court cases upon which they relied," *Neder v. United States* (1999) 527 U.S. 1 (*Neder*) and *Hedgpeth v. Pulido* (2008) 555 U.S. 57 (*Hedgpeth*), "is not whether the reviewing court can say beyond a reasonable doubt that the '*jury's actual verdicts* were not tainted by the inaccurate jury instruction' " (quoting this court's opinion, italics added by the Attorney General), but "whether it is ' "clear beyond a reasonable doubt that *a rational jury* would have found the defendant guilty absent the error" ' " (quoting *Merritt, supra*, 2 Cal.5th at p. 827 (quoting *Neder, supra*, 527 U.S. at p. 18), italics added by the Attorney General).

The Attorney General's formulation of the applicable test, which is based on his selectively italicizing a quotation from *Neder* in the *Merritt* opinion, is not only inconsistent with *Chapman* itself, but sets the bar for affirmance too low under *Aledamat*.  "Consistent with the jury-trial guarantee, the question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand."  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)  "Harmless-error review" under *Chapman*, the high court explained in *Sullivan*, looks to "the basis on which 'the jury *actually rested* its verdict.' [Citation.]  The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (*Ibid*.)

What *Aledamat* holds, in line with *Neder* and *Hedgpeth*, is that an analysis of the actual verdict rendered is but a specific application of the more general *Chapman* standard, which looks to whether, upon an examination of "the entire cause, including

2

the evidence, and considering all relevant circumstances," the error was harmless beyond a reasonable doubt. (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) Besides examination of the actual verdict, there are other permissible modes of analysis for determining that no reasonable jury could have made the finding the actual jury made without also making the necessary findings under a correct set of instructions. (*Neder*, *supra*, 527 U.S. at pp. 18–19; cf. *Hedgpeth*, *supra*, 555 U.S. at p. 61 ["*Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiat[e] *all* the jury's findings." ' "].) Among these other approaches, the *Aledamat* court held, is the one used in *Merritt*. (*Aledamat*, *supra*, 8 Cal.5th at p. 15.)

Our analysis here is fully consistent with *Aledamat*. We do not suggest that examination of the jury's actual verdicts is the only way to determine whether alternative-theory error is reversible under *Chapman*. On this record, we would, and we do, arrive at the same conclusion utilizing the approach in *Merritt*, which looks to whether, based on evidence that is overwhelming and uncontroverted, we are convinced on appeal, beyond a reasonable doubt, that " 'the jury verdict would have been the same absent the error.' " (*Merritt*, *supra*, 2 Cal.5th at p. 832.)

Thompkins fired his rifle into a crowd gathered at the entrance to Sweet Jimmie's, where the scuffle involving Fox occurred. One of the attempted murder victims (Waterman) may have been involved in the scuffle at the door, but all of the others suffered their injuries inside the restaurant. Unlike *Merritt*, where the omitted portions of the instructions went to uncontested elements of the charged offense, in this case the issue of specific intent for the charged attempted murders was a matter of dispute. While the evidence may have been sufficient to convict under a *Stone* theory, as we note above, we cannot say it was overwhelming and we certainly cannot say it was uncontroverted. In fact, any distinction among the victims based on their locations when injured is the very issue the erroneous kill zone instruction allowed the jury to avoid. No matter how plausible it may seem to us that a properly instructed hypothetical jury would have found a specific intent to kill each of the five attempted murder victims, we cannot step in for this jury and so find on appeal.

The modifications effect no change in the judgment.

The Attorney General's amended petition for rehearing is denied.

Dated:  June 17, 2020                    POLLAK, P. J.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Vernon K. Nakahara |
| Counsel for plaintiff and respondent: | Xavier Becerra, Attorney General of California; Lance E. Winters, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Catherine A. Rivlin, Supervising Deputy Attorney General; Bruce M. Slavin, Deputy Attorney General |
| Counsel for defendant and appellant Clem Thompkins: | Stephen B. Bedrick, under appointment by the Court of Appeal |
| Counsel for defendant and appellant Lamar Fox: | Neil Jacob Rosenbaum, under appointment by the Court of Appeal |

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CLEM THOMPKINS et al.,<br><br>     Defendants and Appellants. | A141375<br><br>(Alameda County<br>Super. Ct. No. 168583A/B) |

## I. INTRODUCTION

Late on Easter night in 2011, gunfire erupted at Sweet Jimmie's bar and restaurant in Oakland, leaving two people dead and five wounded. Defendants Clem Thompkins and Lamar Fox both were convicted of two counts of first degree murder for the benefit of a criminal street gang, with firearm discharge enhancements, a multiple-murder special circumstance, and five counts of attempted murder with great bodily injury findings, gang enhancements, and firearm discharge enhancements. Thompkins was charged and convicted as the shooter and Fox as an accomplice. Both men received the same sentence: life in prison without possibility of parole, plus 224 years to life.

After Thompkins was sentenced and had appealed, when Fox came on for sentencing, Fox told the court under oath he was the actual shooter and Thompkins knew nothing about Fox's intentions. On appeal and in a separate petition for writ of habeas corpus (*In re Thompkins on Habeas Corpus* (July 16, 2019, No. A147135)), Thompkins claimed this new testimony, and his attorney's professionally incompetent reaction to it,

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.A.2, III.A.3, III.A.5, III.A.6, and III.B through III.F.

entitle him to a new trial. Thompkins's habeas petition presented additional new evidence that Fox was the shooter in the form of a declaration by another gang member who was with Fox and Thompkins that night.

We conclude in the direct appeal that Thompkins's trial counsel was not ineffective for failing to bring the matter before the court in a motion to recall the sentence followed by a new trial motion because Thompkins has failed to show prejudice. The remaining arguments that the newly discovered evidence calls for a new trial and related ineffective assistance of counsel arguments were considered in the habeas matter. We issued an order to show cause returnable before the superior court and stayed the appeal pending the outcome of the habeas proceeding. The superior court judge who presided over the trial, Judge Vernon J. Nakahara (now retired), also presided over a three-day evidentiary hearing on the issues raised in the habeas petition, after which he filed a 55-page opinion denying the petition and finding Fox's posttrial confession not credible.

Because this case has been pending for an unusually long time, several posttrial legal developments have affected our analysis. We address first the issues raised based on posttrial case law and statutory amendments to Penal Code sections 188, 189, 12022.5 and 12022.53.[1] Defendants also raise individually or jointly evidentiary, instructional and sentencing issues, ineffective assistance of counsel, claims of clerical error, and cumulative prejudice. We reject most of these claims either on the merits, as forfeited, or as harmless error.

We do conclude, however, that (1) the five attempted murder convictions and related enhancements must be reversed for both defendants based on the erroneous giving of a flawed kill zone instruction under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) and other authority; (2) there was instructional error under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) as to Fox, but it was harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); (3) introducing evidence that defendants admitted

---

[1] Further statutory references, unless otherwise indicated, are to the Penal Code.

their gang affiliation at jail intake violated the defendants' privilege against self-incrimination under *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), but it was harmless beyond a reasonable doubt; (4) there was some evidentiary error under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which was harmless even under *Chapman* due to the wealth of admissible evidence establishing the gang enhancements; (5) arguments based on the statutory amendments to sections 188 and 189 must be raised by petition in the trial court (§ 1170.95); (6) the special-circumstance finding applied only to the charge under count 2, and an amended abstract of judgment must so reflect; (7) gang enhancements (§ 186.22) should not have been imposed against Fox on counts 3 through 7 and must not be imposed if Fox is again convicted of these counts on remand (§ 12022.53, subd. (e)(2)); and (8) the case must be returned to the trial court so the judge may exercise his discretion whether to impose or strike the firearm enhancements on counts 1 and 2 under section 12022.53, in light of an amendment to section 12022.53, subdivision (h).  Only the discussion of items (1) and (4) above will appear in the published portion of the opinion.

## II. BACKGROUND

### A.  Overview

Sweet Jimmie's was a family-run, second-generation Black-owned restaurant and bar located on Broadway, between Third and Fourth Streets, near Oakland's Jack London Square.  On Easter Sunday 2011, as Sunday turned into Monday, many of the remaining 10 to 20 guests in the bar knew each other or knew the owner.  About 12:45 a.m. on Monday, April 25, 2011, a late model white Toyota Camry with no license plates double-parked outside Sweet Jimmie's.  There were four men in the car.  Three of them got out.  The driver stayed in the car.

One of the men, whose hair was in dreadlocks, went to Sweet Jimmie's front door and shortly had a brief shoving match with some of the customers of the bar.  He was ejected by some of the bar's patrons, and he left the bar entryway.  By most accounts, the driver then got out of the car with an assault rifle in hand, walked to the entrance of

3

Sweet Jimmie's, and opened fire on the restaurant's guests. Two people were killed and five others wounded.

The prosecution's theory was that the men in the car belonged to the Lower Bottoms street gang, and the shooting resulted from an incident earlier that evening near Sweet Jimmie's in which a member of the rival Acorn gang flashed a handgun at one of the men. The four then went and got an assault rifle from Fox's house and returned to Sweet Jimmie's, looking to kill members of the Acorn gang. They did not find their rivals at the bar; the people shot were not gang members. But the scuffle involving the man in dreadlocks was sufficient to trigger a violent reaction from the driver of the car, according to a gang expert, because a retaliatory attack would increase the public's fear of the gang and give the shooter increased status among gangsters.

## B. The Gang Expert's General Background Testimony

Oakland Police Officer Steve Valle testified as an expert on West Oakland gangs. Valle identified three primary West Oakland gangs, each reflecting the name of the neighborhood in which it was based: Lower Bottoms, Ghost Town, and Acorn. The gangs were mutual enemies and were at war. Lower Bottoms was a criminal street gang with several subsets based on the street corner they claimed, such as the Center gang and Campbell Village Gangsters. Lower Bottoms also contained a clique called the 30 Gang, which took its name from high capacity magazines that hold 30 rounds of ammunition. Acorn identified with the letter "A" and members sometimes wore Oakland A's or Atlanta Braves baseball caps. Lower Bottoms claimed the letters "L" and "B" for Lower Bottoms and "C" for "Center" (a street in the Lower Bottoms neighborhood of Oakland and a gang subset). Members sometimes wore Chicago Cubs baseball caps.

In April 2011, Lower Bottoms had 50 or more members. Lower Bottoms was an informal gang with no identifiable hierarchy, structure, or bylaws. Even without a formal structure, there were members of the gang who were shot-callers, who influenced the direction of the gang and told other members what to do. If a member disobeyed a shot-caller there might be a violent response. Gang members build respect for themselves and the gang by committing acts of violence in the company of other members.

4

## C. Testimony of Witnesses Inside Sweet Jimmie's

Several patrons of Sweet Jimmie's testified at trial that a Black man with dreadlocks approached the entrance to the bar. One witness described him as wearing jeans, a black hooded sweatshirt, and a Chicago Cubs baseball cap, carrying a water bottle in his left hand. More than one customer saw a short-haired Black man with him, and another witness told the police there were one or two others with him.

Several witnesses described an incident in which the man with dreadlocks became engaged in a scuffle with some patrons near the front door of the bar. Some of them said the dispute began when the man with dreadlocks "flipped" or tugged on someone's neck chain or medallion, perhaps trying to pull it off. Those witnesses were David Ward, the owner of Sweet Jimmie's; Miah Sims, a regular customer at Sweet Jimmie's who was seated near the front of the restaurant with a friend, six to eight feet from the front door; Robert Baskin, an out-of-towner who frequented the bar while working in Oakland and who was seated 15 to 20 feet from the door; and Ward's nephew, Robert "Piglet" Ford, who was at the back corner of the bar. Ward saw someone's shirt being lifted up during the scuffle. For a few seconds, there was pushing and shoving. Baskin and Sims testified friends of the man with the neck chain "hemmed" up the man with dreadlocks, essentially surrounding him before pushing him out of the bar entryway. The man with dreadlocks was either pushed from or backed away from the entrance and seemed to have left the immediate area.

Less than a minute later, a man with dreadlocks appeared at the entrance to the restaurant and fired into the crowd. Sims thought it was the same man who came back and fired the shots. She identified that man as Thompkins and said he "patted down" the man wearing the medallion with his left hand before shooting. Baskin, too, thought it might have been the same man. Baskin said the man in dreadlocks came back a few seconds after he left and said, "Fuck that." The second time the man with dreadlocks appeared in the doorway and lifted his right hand, Baskin turned away and the gunfire began. Baskin did not actually see the man holding a gun that night, nor did Ward or

5

Sims.  Baskin was shot twice in the left leg, injuring him in four places.  Ward was not injured.

Other witnesses said the gunman was a different man with dreadlocks.  Ward saw a second man with dreadlocks approach Sweet Jimmie's from the direction of Third Street.  Ward was not able to identify Thompkins from a photo lineup.  Ward testified the shooter was not the same man he had seen pulling someone's neck chain, but Baskin was not sure.

Two other patrons, Carvell Stemley and Ford, also said the gunman was a second man with dreadlocks, but they testified they actually saw him come from the driver's side of the white car and approach the entrance to Sweet Jimmie's.  Stemley, who had been in the bar but had not been drinking, stepped outside when he was told by his friend, Luke Waterman, there was a problem at the door.  When he got outside, Stemley saw "just a lot of little commotion.  Nothing too drastic."  He saw two Black men, one with long dreadlocks and one with short hair.  He testified he then saw a man with dreadlocks exit the driver's door of the white car and walk around the car in a "militant" way, but Stemley did not see a gun.  Stemley said the second man with dreadlocks could have been Black; he was not White.

Ford's testimony was more explicit.  He said 10 or 15 seconds after the first man was ejected from the bar, another Black man with dreadlocks got out of the driver's side of a white car that was double-parked outside.  With a semiautomatic rifle in hand, the man walked around the back of the car and approached the entrance to Sweet Jimmie's.  Seconds later the shooting started.  Ford heard 10 to 15 gunshots.  Ford testified the gunman was not the same man he saw pulling someone's neck chain.  Ford told the police that the person involved in the commotion "signaled to somebody and then the shooting happened."  Neither Ford nor Stemley was hit by the bullets and neither could identify the shooter in a photo lineup.

## D. The Aftermath

Altogether, seven people were hit by bullets that night. Billy Jenkins and Adam Williams (Adam) were killed.[2] Sims was shot in her leg and pelvis. She was off work for a month, had surgery twice, and needed assistance walking for the next four months. Mandi Lee, Sims's companion, suffered a grazing wound to her calf, which left a scar. Baskin was wounded in the leg and thigh. Señorita Freeman was hit in the forearm, requiring surgery, and resulting in a plate being installed in her arm. Of the survivors, then 28-year-old Waterman suffered the most serious injuries. Shot in the head and leg, he required three operations, was in the hospital for two months, and was left with a plate in his head. Despite physical and speech therapy, his ability to speak was very limited at trial, and his right side was almost paralyzed. He could no longer use his right arm, and he walked with a limp. He could no longer write. He also had memory problems and had no memory of the shooting incident. Waterman was wearing a chain with a ring on it around his neck at the time of the shooting, which suggests he may have been involved in the scuffle at the front door. But Ford, who knew Waterman, said it was not Waterman whose chain the man with dreadlocks had tugged on.

When the crime scene was processed, 10 spent cartridges and one live round were found, all from a 7.62 by 39-millimeter caliber gun. No other bullet casings from a different caliber weapon were recovered. Seven of the casings were found outside the bar, and the other three were found inside. One live round (7.62 by 39-millimeter) was found on the sidewalk outside the bar.

## E. Discovery of the Murder Weapon and Arrest of Defendants

Three weeks after the shooting, Fox was at his mother's house when Oakland police officers executed a search warrant relating to his brother's suspected narcotics activity. The officers did not find any drugs, but they did find Fox in the same room with

---

[2] One of the witnesses who also played a role in the events of April 24-25, 2011, bears the same surname, namely Brian Williams. When we refer simply to "Williams" we refer to Brian Williams, not Adam Williams. We refer to Adam Williams by his first name. No disrespect is intended.

a modified SKS semi-automatic assault rifle, whose stock had been sawed off, to which a detachable magazine had been affixed, along with a folding bayonet. The rifle was equipped with a magazine containing ammunition, and one additional round was chambered. Fox, whose hair was in dreadlocks down to his waist, was arrested for a parole violation, and the gun was seized.

After Fox's arrest, criminalists from the Oakland Police Department Firearms Unit examined the assault rifle. They compared test-fired bullet casings from the SKS to those found at the Sweet Jimmie's crime scene. One of them testified that all 10 casings found at the scene were 7.62 by 39-millimeter caliber and at least nine, and most likely all 10, were fired from the SKS assault rifle. Because one casing did not have a primer, the criminalist could not say for sure it had been fired, but it had been cycled through the same firearm and likely had been fired from it. He also examined the one live cartridge recovered at the scene. It was the same caliber and had markings showing it had been cycled through the same firearm. He found no ballistic evidence supporting a theory that a second gun had been fired at Sweet Jimmie's.

The police had received information as early as the day after the shooting suggesting Thompkins was involved and the shooting was gang-related. In mid-May 2011, Baskin identified the shooter as Thompkins from a photo lineup, but could not identify Fox. At trial, however, he was not able to identify either defendant as the gunman, apparently because at that time neither wore dreadlocks. Baskin's testimony also called into question whether he had actually identified Thompkins as the shooter or as the man in dreadlocks involved in the initial ruckus at the front door, as Baskin, like Sims, thought they might be the same person.

On June 8, 2011, Lieutenant Tony Jones of the Oakland Police Department interviewed Sims, and she identified Thompkins's photo as the gunman at Sweet Jimmie's, and she identified him at trial. On June 15, 2011, the police arrested Thompkins for the Sweet Jimmie's shooting and two days later filed a felony complaint against him alleging he was the shooter. Lieutenant Jones and another officer interviewed him that same day. Thompkins's statement was not introduced at trial, but

he told them Fox, whose nickname was "Mar Mar," was the shooter. Fox was not charged until May 15, 2012, and then only as an accomplice.

### F. Fox's Pretrial Statements

#### 1. *Phone Calls from Jail*

Fox was arrested on the parole violation nearly a month before Thompkins was arrested. On the date of his arrest, Fox made two phone calls from jail to Thompkins. The calls were recorded and excerpts played for the jury. In the first call Fox said, "I fucked up, brah. It's a wrap brah. I just know it this time." A woman on the line asked Fox, "If you didn't do nothing, why are you saying it's a wrap?" Fox replied, "Because, man, they went in the house and found a gun and hella shit." Thompkins said "Bro, you told me you put that somewhere up already." Fox continued in self-reproach.

In the second call, Fox said to Thompkins, "I fucked up. But you feel me, bro, like I said, bro, I love you. I made the bed, I'm gonna lay in it nigger." A short time later, Thompkins told Fox, "You and that were never supposed to be in the same place. Man. You hear me?" Fox responded, "Fuck, bro. I fucked up so much." In the second call, Fox also told Thompkins that "whatever time it is, bro. Never, nigger. I ain't never, nigger, on the real nigger, if I got to go sit down, brah, you already know it's nothing." "Sitting down," Lieutenant Jones explained, means going to jail. Fox was saying "he'll do time; he won't tell; he's not going to say anything to police." To that Thompkins replied, "Ain't no snitches ride with us."

Partly because of the dynamics of the telephone calls, with Fox confessing error and apologizing to Thompkins, while Thompkins reprimanded Fox, it may be inferred that Thompkins had more status within the gang than Fox did. This was later confirmed by Christopher Nelson, one of the men in the white Toyota, who ultimately testified Thompkins was, at least by reputation, the "leader" of the Lower Bottoms gang, and by Officer Valle, who had known of Thompkins as a gang member for years.

#### 2. *Police Interviews*

Lieutenant Jones interviewed Fox twice: first on June 1, 2011, and again on June 29, 2011. Both interviews were video recorded. In the first, Fox did not admit

being at Sweet Jimmie's at the time of the shooting. In the second, he admitted he was at Sweet Jimmie's that night and supplied the rifle for the attack. Fox denied being the shooter and said he did not know the shooting was going to happen. Though it was not disclosed to the jury, Fox named Thompkins as the shooter.[3]

Fox did not testify at trial. A redacted version of his June 29 statement to the police was admitted into evidence and played for the jury. The trial court instructed the jury this statement was only admissible against Fox, not Thompkins. The trial court also told the jury Fox's statement had been edited and the jury was "not to speculate about portions of [his] statement that you did not hear." In the redacted recording, different segments of the interview appear as vignettes, separated by blank video, which eliminates any misperception that the action is continuous.

In the redacted version, Fox said he was in a brand new white four-door Camry on the night of the shooting. He went to Sweet Jimmie's, where he stopped to talk to two friends in front of the bar. While he was talking to them, he saw an "Acorn cat" standing in front of Nation's Hamburgers next door. The Acorn gang member, who was dressed all in white, had a handgun stuck in his waistband. He lifted up his shirt to expose the gun and gestured toward Fox in a challenging manner.

Fox got into the car and went "East," got the SKS assault rifle, and returned to Jack London Square. He stopped to talk to some people lined up in front of Sweet Jimmie's. He looked for Acorn gang members but did not see any. As he was talking to people in the entrance to Sweet Jimmie's, some people pushed him away. Fox said, "I knew had a weapon in the car, but there wasn't really no need for that."

The redacted recording resumed with a description of what happened after the shooting. Fox said he put the rifle ("the banger") in the same place where the police found it. Asked if he was "supposed to get rid of it," he said he had tried but had trouble selling it because buyers wanted smaller, concealable firearms.

---

[3] It appears the police induced Fox to talk by showing him a video recording of Thompkins's interview in which Thompkins claimed Fox was the shooter.

10

## G. The Charges

Nearly a year after Thompkins was charged, Fox was also charged, and the cases were later consolidated.  The district attorney charged both Thompkins and Fox with two counts of first degree murder (counts 1 and 2) (§ 187), five counts of attempted murder (counts 3 through 7) (§§ 187, 664), and one count each of felon in possession of a firearm (count 8) (§ 12021, subd. (a)(1)).  Thompkins was charged solely as the shooter based on personal use of a firearm and personal intentional discharge allegations, whereas Fox was charged as an accomplice based on allegations that a principal used and discharged a firearm (§ 12022.53, subds. (b)-(e)(1)).  Great bodily injury was alleged on counts 1 through 7, as were firearm enhancements and gang enhancements.  (§§ 186.22, subds. (b)(1) & (b)(5), 12022.7, subd. (a), 12022.53.)  The special circumstance of multiple murders was charged on the second murder count (§ 190.2, subd. (a)(3)).  It was further alleged that Thompkins had two prior convictions: one for possession of a firearm by a felon in 2009 (§ 12021, subd. (a)(1)), and one for possession of heroin for sale in 2008 (Health & Saf. Code, § 11351), and Fox had two prior convictions: one for robbery in 2008 (§ 211) and one for sale of a controlled substance in 2009 (Health & Saf. Code, § 11352, subd. (a)).  One conviction for each defendant was alleged as a prison prior (§ 667.5, former subd. (b)), and Fox's robbery conviction was alleged as a strike prior (§§ 667, subds. (e)(1), 1170.12, subd. (c)(1)) and a five-year serious felony prior (§ 667, subd. (a)(1)).

## H. The Prosecution's Star Witness: Christopher Nelson

The prosecution's star witness was Christopher Nelson, one of the occupants of the white Toyota.  He identified the other occupants as Thompkins, Fox, and Tyree James.  Nelson testified that on April 24, 2011 (Easter Sunday), he and his friend James were hanging out and drinking in West Oakland.  Around noon Thompkins and Fox, who belonged to the 30 Gang subset of the Lower Bottoms gang, drove up in a white four-door sedan.  Nelson testified he was not a member of any gang and he had no gang tattoos.  James had Lower Bottoms gang tattoos on his forearms, but Nelson did not think he was a member of the gang.  Nelson did not spend a lot of time with Thompkins and

11

Fox, but he was friends with James and associated with Fox and Thompkins so he could feel like he "fit in" with other people in his neighborhood. In fact, Nelson testified the day of the shooting was the first time he had met Thompkins and Fox.

Thompkins was driving and Fox was in the front passenger seat. Thompkins and Fox both had dreadlocks, while Nelson and James had short hair. Nelson and James climbed into the back seat, and the four men spent the rest of the day driving around, drinking gin and taking Ecstasy. Nelson consumed one Ecstasy pill and "a gallon" of gin and juice. By nightfall, he was very drunk, and so were the others.

Late that night the four men drove to the 300 block of Broadway, near Jack London Square. They got out of the car and talked to some girls who were in line outside Sweet Jimmie's, waiting to get in. Next door, in front of Nation's Hamburgers, Fox got into an argument with a member of Acorn, one of Lower Bottoms's rival gangs. After about 15 minutes, the four men went back to their car and drove off, with Thompkins still driving.

They drove to Fox's house in the Dubs neighborhood of Oakland, where Fox retrieved an assault rifle, which he gave to Thompkins. En route to Fox's house, Thompkins said something about "bitch ass Acorn niggas." Nelson understood Fox and Thompkins were talking about "killing the Acorn guys," though their conversation was not explicit. From Fox's house, the men drove back to downtown Oakland, looking for members of the Acorn gang. Thompkins double-parked in the middle of the street near Sweet Jimmie's. Fox, James, and Nelson got out; Thompkins stayed in the car. Nelson and James approached some girls who were standing outside Sweet Jimmie's.

Near the restaurant entrance, Fox got into an argument with some of the people waiting in line to get into Sweet Jimmie's.[4] The Acorn member with whom he had argued earlier that night was not among them. When Nelson saw a dispute developing he said to Fox, "Let's go." At that point, Thompkins emerged from the car, holding the

---

[4] Other witnesses testified there was no line waiting to get into Sweet Jimmie's and the confrontation occurred in the entryway to the bar itself.

assault rifle in his right hand, down by his side.  He walked up to Sweet Jimmie's front door and opened fire.  There was no doubt in Nelson's mind that Thompkins was the gunman.  He told the prosecution's investigator he was "100 percent" sure.

As far as Nelson knew, Thompkins made the decision to shoot on his own. Nelson's testimony differed from the first statement he gave to the police because, as we shall discuss, he originally named Fox as the shooter.

When Nelson heard the shots, he went back to the car.  The other three quickly joined him.  They drove away, with Fox driving.  No one spoke.  Nelson and James got out when they reached the Bottoms district of Oakland.  "Don't say anything," Thompkins told them.  The next day Nelson learned from television that two people had been killed.

A couple days after the shooting, Thompkins phoned James while Nelson was with him and again told them not to say anything.  Fox was with Thompkins at the time. Nelson overheard Fox say in the background they "might got to get [Nelson]" (i.e., kill him), which scared Nelson.

For the next seven months, Nelson said nothing to the police.  During that time members of 30 Gang—but not Thompkins or Fox—threatened him, beat him up, robbed him, and accused him of being a snitch.  Nelson also testified one of the men who beat him up told him Thompkins had put a "green light" on killing him.  Around Christmas 2011, someone tried to shoot Nelson.  At trial, nearly two years later, he was still afraid of being killed.  He asked to be put into a witness protection program, but at the time of trial had not been informed if his request would be granted.

Nelson was arrested in November 2011, at which point he talked to the police— but he initially told them Fox was the one who shot up Sweet Jimmie's.  He later told them Thompkins was the shooter and repeated that story to the deputy district attorney in September 2013.  Nelson testified he lied at first because someone (he could not remember who) told him he should say Fox was the shooter—supposedly passing on a message from Thompkins.

13

Nelson had been convicted of an unrelated assault with a firearm in Contra Costa County and was serving a jail sentence at the time he testified. He also had been caught with a gun when he was 18 or 19. He was not prosecuted for the Sweet Jimmie's shooting. He claimed he was testifying voluntarily in this case, was telling the truth, and had been promised nothing.

## I. The Man Dressed All in White

The man dressed all in white who Fox and the others thought was an Acorn gang member turned out to be Brian Williams. Officer Valle opined that Williams was a member of the Acorn gang subset, the Gas Team. Ward identified him as having been at Sweet Jimmie's that night. Williams testified at trial that he had no gang involvement and virtually no memory of anything from the night of the shooting.

He had also been interviewed by the police two weeks after the shooting and told them he did not have a gun on him that night ("I didn't have nothing on me man"). He was "Acorn born and raised," but he had just been trying to have a good time by going to a Lil Wayne concert at Oracle Arena earlier in the evening with friends, then going to Sweet Jimmie's for dinner, and then to Kimball's nightclub for an after-concert party.

After eating, he and his friends left Sweet Jimmie's on their way to Kimball's and were standing near Nation's Hamburgers when Williams saw a white car drive by. He saw three or four men in the car and knew "it was all bad" because "them dudes ain't cool." He had been alerted about three days before the shooting to watch out for a white Camry with no license plates, which was associated with Lower Bottoms. Williams and his friends went to Kimball's after seeing the white car.

The jury asked to have the DVD of Williams's police interview delivered to the jury room during deliberations, as well as those of Fox's June 29, 2011 interview and the recorded telephone calls he placed from jail. The jury also asked for and received a readback of Nelson's testimony about who was involved in the "two arguments."

14

### J. The Verdicts

The jury found Thompkins guilty of two counts of first degree murder for the benefit of a criminal street gang (§§ 186.22, subd. (b)(5), 187), with personal use of a firearm, personal intentional discharge, and death or great bodily injury resulting from personal intentional discharge of a firearm (§§ 12022.5, subd (a), 12022.7, subd. (a), 12022.53, subds. (b), (c) & (d)). The jury found Fox guilty of two counts of first degree murder for the benefit of a criminal street gang (§§ 186.22, subd. (b)(5), 187), in which a principal used a firearm, intentionally discharged it, and thereby caused great bodily injury or death (§§ 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (b), (c), (d) & (e)(1)). Thus, the jury agreed with the prosecutor's theory that Thompkins was the shooter and Fox an accomplice.

The jury also convicted each defendant of five counts of attempted murder with great bodily injury, and with gang and firearm discharge enhancements. (§§ 186.22, subd. (b)(1), 187, 664, 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (b), (c), (d) & (e).) Both Thompkins and Fox were convicted of possession of a firearm by a felon. Both defendants admitted their prior convictions outside the jury's presence.

Because the shooting was a gang offense, section 12022.53, subdivision (e)(1) made Fox subject to the same 25-year-to-life enhancement penalty as the shooter (§ 12022.53, subds. (b), (c), (d) & (e)(1)), except, as we shall discuss, he was not subject to a gang enhancement in addition (§ 12022.53, subd. (e)(2)), which was imposed in error on counts 3 through 7. The jury found defendants were subject to a multiple-murder special-circumstance penalty on count 2, which subjected both defendants to a term of life without possibility of parole. (§ 190.2, subd. (a)(3).)

### K. The Sentencing and Fox's Confession

Defendants were sentenced in separate hearings. Thompkins was sentenced to life without possibility of parole (LWOP), plus 224 years to life on March 19, 2014. He filed a notice of appeal the same day. At Fox's sentencing three weeks later, there was some talk of Fox having turned down the prospect of receiving a resolution of imprisonment for less than LWOP. Fox said he was not interested in any such deal, insisted on

15

proceeding to sentencing, and after being sentenced to LWOP, plus 224 years to life, he asked permission to address the court.

Fox confessed he was the shooter at Sweet Jimmie's and accepted sole responsibility: "Clem Thompkins never shot anybody. Clem Thompkins never did anything. Clem Thompkins was at the front of the door where people said they seen him at. It was me who got out of the car with the gun because I thought I saw somebody inside Sweet Jimmie's with a gun. And I was drunk. I wasn't thinking straight. I just want the court to know that Clem Thompkins never did anything. It was all me. It was all my thinking. Nobody didn't never knew I was going to do it. I made a wrong judgment call. Nobody. Nobody never knew it. They never knew I was going to shoot or do anything." The judge commented, "if that's believable, that might change things," and agreed to take Fox's testimony at the request of Thompkins's trial counsel.

Fox was placed under oath, subject to cross-examination, and described the events much as Nelson did, except he claimed he was the driver of the white car, not Thompkins. Under oath, and against counsel's advice, Fox claimed to have been the shooter and said none of the others knew what he was going to do. He also claimed Thompkins was the one who got into the initial scuffle with the people in Sweet Jimmie's doorway.

After placing Fox's testimony on the record, Judge Nakahara gave no opinion on Fox's credibility, unless his failure to recall Thompkins's sentence has some communicative value, perhaps implicitly suggesting he found Fox's confession unworthy of belief. Thompkins's attorney said he planned to file a motion for a new trial, but the court told him it was too late because Thompkins had already filed a notice of appeal. Thompkins' lawyer continued to indicate he might file "some kind of motion," but no such motion ever materialized. Fox also appealed.

L.     **Thompkins's Petitions for Writ of Habeas Corpus**

In addition to appealing his convictions, Thompkins also filed two petitions for writ of habeas corpus in this court, one of which has already been denied after an order to

16

show cause returnable before the superior court (A147135). The other, filed August 20, 2019 (A158110) is pending before this court and will be resolved by separate order.

### M.    Issues on Appeal

Several of the issues raised by defendants invoke changes in the law after judgment was imposed, based on new authority from the Supreme Court or statutory amendment while the appeal was pending. We will address those issues first.

The most recent new development claimed by defendants to affect this appeal— and the most significant—was the Supreme Court's restriction on use of a so-called "kill zone" instruction (CALJIC No. 8.66.1, 1 CALCRIM No. 600), such as that given in this case. (*Canizales*, *supra*, 7 Cal.5th 591.) Fox also argues his first degree murder convictions cannot stand under *Chiu*, *supra*, 59 Cal.4th 155 because he was not the shooter and the jury could have relied on the natural and probable consequences doctrine to convict him, without regard to his individual state of mind. Incongruously, relying on Fox's confession at his sentencing, Thompkins claims *he* was the nonshooter and was entitled to a reduction in the first degree murder counts to second degree murder under *Chiu*. Both defendants claim their admissions of gang membership at jail intake were improperly allowed into evidence under *Elizalde, supra*, 61 Cal.4th 423.

In addition to postjudgment case law, defendants interpret some postjudgment statutory changes as affording them relief by retroactive application. Senate Bill No. 1437 (Stats. 2018, ch.1015, § 2) amended sections 188 and 189 so, effective January 1, 2019, the rules relating to felony murder and accomplice liability in murder cases are now more lenient for nonkillers. Fox claims the new rule requires a reduction in criminal culpability for his role in the crimes. In addition to that amendment, Senate Bill No. 620 (Stats. 2017, ch. 682, § 2), effective January 1, 2018, amended section 12022.53 so as to grant a sentencing judge discretion either to impose or dismiss the firearm enhancements provided under that section, whereas imposition of the enhancements had previously been mandatory. (Compare § 12022.53, subd. (h) with § 12022.53, former subd. (h).) Both defendants claim they are entitled to a remand for resentencing in light of that amendment.

In addition to claims of evidentiary error under new legal authority, Thompkins makes a more routine claim under *Bruton v. United States* (1968) 391 U.S. 123, 135-136 (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518, 530-531 (*Aranda*) based on the admission into evidence of a redacted video of Fox's June 29, 2011 interview with the police. Thompkins also claims Investigator Phillips should not have been allowed to testify that he believed Nelson was telling the truth, and Nelson should not have been allowed to testify that he heard Thompkins had given the "green light" to kill him.

With respect to instructional error, both defendants claim the court erred in failing to give voluntary manslaughter and attempted manslaughter instructions. Thompkins also argues that the jury should have been instructed that Fox was potentially an accomplice, and as such, his testimony must be viewed with caution. Fox argues he was entitled to an instruction on voluntary intoxication.

Fox correctly points out that a gang enhancement was improperly imposed on him as a nonkiller, when a firearms enhancement was also imposed on counts 3 through 7. (§ 12022.53, subd. (e)(2).) Defendants also raise a sentencing issue—imposition of a great bodily injury enhancement on count 7—that is moot in light of our decision to reverse the attempted murder convictions (counts 3 through 7).

Thompkins argues, in light of Fox's confession at sentencing, that he was entitled to prevail on a motion for a new trial, and his attorney was ineffective in failing to move to recall his sentence so that he could move for one. We also address Fox's claims of clerical error and both defendants' contention that the errors, assessed cumulatively, were prejudicial.

### III. DISCUSSION

### A. ISSUES BASED ON POSTJUDGMENT LEGAL DEVELOPMENTS

### 1. *People v. Canizales* (2019) 7 Cal.5th 591: The Kill Zone Instruction

*a. The Kill Zone Theory of Attempted Murder*

The Supreme Court last year undertook to clarify the kill zone theory of attempted murder and the circumstances under which the jury may be given a kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 602-616.) *Canizales* involved a gang-related shooting

at a neighborhood block party that left an innocent woman dead. (*Id*. at pp. 598-602.) That woman was not the target of the shooting; she was dancing in the street to the music playing on her car radio when she was struck by a stray bullet meant for someone else. (*Id*. at pp. 599-600.) Five spent nine-millimeter cartridges were found at the site of the shooting, and it eventually came to appear that the five had been fired by KeAndre Windfield from a distance of approximately 100 to 160 feet (*id*. at p. 600), while in the company of and with the encouragement of Michael Canizales, both of whom were members of the Ramona Blocc gang (*id*. at pp. 598, 616). Though neither of them was shot (*id*. at p. 600), the prosecution would ultimately theorize that Denzell Pride was Windfield's main target, while Travion Bolden may have been a secondary target (*id*. at p. 616). Pride and Bolden were members of a rival gang called Hustla Squad Clicc. (*Id*. at p. 598.)

The district attorney charged Windfield and Canizales with one count of murder, two counts of attempted murder, and street terrorism.[5] (*Canizales*, *supra*, 7 Cal.4th at p. 600.) The evidence was fairly strong that Pride was specifically targeted due to a run-in he and Canizales had earlier on the day of the shooting. (*Id*. at p. 616.) There was not such clear evidence that Bolden was specifically targeted, but he was close to Pride at the time of the shooting. (*Id*. at pp. 601, 614.) The trial was conducted on the theory that Pride was the main target, while Bolden was within a zone of danger around Pride. (*Id*. at pp. 609-610.) The trial court gave a kill zone instruction on the attempted murder charge involving Bolden. (*Id*. at p. 597.) The Supreme Court reversed the attempted murder conviction and related enhancements pertaining to Bolden because, although the jury could have legitimately convicted the defendants of his attempted murder, it was also possible the jury improperly relied on the kill zone theory in reaching its verdict on the Bolden shooting. (*Id*. at pp. 601, 612-618.)

---

[5] They were convicted on all counts, but Canizales's first degree murder conviction was reduced to second degree under *Chiu*, *supra*, 59 Cal.4th 155. (*Canizales*, *supra*, 7 Cal.5th at p. 601.)

The Supreme Court has repeatedly expressed skepticism over the general utility of a kill zone instruction (*Canizales*, *supra*, 7 Cal.5th at pp. 596-598, 608; *People v. Stone* (2009) 46 Cal.4th 131, 137-138 (*Stone*); *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6 (*Bland*)), noting it is a matter that can be left for the jury to infer. (*Stone*, at pp. 137-138.) In *Canizales*, it recognized the "potential for the misapplication of the kill zone theory, as evidenced by prior appellate cases," which implied the theory had been overused in California trials. (*Canizales*, at p. 606.) *Canizales* explained "the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the *only reasonable inference* is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant *intended to kill everyone present to ensure the primary target's death*—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at p. 607, italics added; see also *id.* at p. 597.) In a case involving multiple alleged victims of attempted murder, the instruction is prosecution-friendly in that it makes it possible to secure attempted murder convictions without individual-by-individual proof of intent to kill.

Indeed, *Canizales* was written with an eye toward reining in prosecutors who might like to rely on a kill zone theory in any case in which a "single act is charged as an attempt on the lives of two or more persons." (*Canizales*, *supra*, 7 Cal.5th at p. 602.) The Supreme Court cautioned trial courts against overuse of any type of kill zone instruction. While specifically declining to analyze the constitutionality of a pattern instruction commonly used in California and the one used in *Canizales*, CALCRIM No. 600 (*id.* at pp. 597, 618), the court did conclude that "when a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better

20

describe the contours and limits of the kill zone theory as we have laid them out here" (*id.* at p. 609). The same criticism applies to CALJIC No. 8.66.1 used in the present case.

The kill zone theory is a device of relatively recent origin. It was first adopted in California in *Bland*, *supra*, 28 Cal.4th 313 in 2002, and it originated in Maryland roughly a decade earlier in *Ford v. State* (1993) 625 A.2d 984, 997-1001. One complication that the kill zone theory attempts to address is the difference in the treatment of transferred intent in cases of murder versus attempted murder. In a murder case, if the defendant intended to kill one person but killed someone else instead, we say that his murderous intent was transferred from the intended victim to the actual victim. (*Stone*, *supra*, 46 Cal.4th at p. 139; *Bland*, *supra,* at pp. 320-321.) If a defendant kills the intended victim and others as well, he is guilty of murdering all that he killed. (*Bland*, at pp. 317, 323-326; *People v. Souza* (2012) 54 Cal.4th 90, 120.)

On the other hand, "[w]hen a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602; see also *Bland*, *supra*, 28 Cal.4th at pp. 326-331.) The kill zone theory was adopted to address the situation in which a killer intends to kill one person, as well as all the people in the intended victim's immediate vicinity, to ensure the death of the intended victim. In such a case—and only in such a case—the kill zone instruction may be used, and the defendant may be found guilty of attempted murder of anyone in the kill zone.

"Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone

21

instruction should not be given.' " (*Ibid.*) "Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Id.* at p. 608, original italics.) "When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, evidence of a primary target is required." (*Ibid.*; see also *People v. Mariscal* (2020) 47 Cal.App.5th 129, 137-138; cf. *People v. Cerda* (2020) 45 Cal.App.5th 1, 19 [unnecessary to identify by name specific targets of attempted murder convictions where they could be identified categorically as members of a rival gang], petn. for review pending, petn. filed Mar. 10, 2020.)

A kill zone instruction was given in this case, apparently given at the court's own suggestion, as the prosecutor's request for jury instructions did not list CALIC No. 8.66.1. At the instructional conference, Thompkins's trial attorney, Darryl Billups, pointed out to the judge this fundamental problem with giving a kill zone instruction. Billups did not make an explicit objection to the instruction, but his remarks preserved the issue for Thompkins. Fox's counsel did not join in the protest, but that does not matter, as defendants' substantial rights are at stake (§ 1259) and because *Canizales* is new authority further restricting the use of a kill zone theory.[6]

"THE COURT: Okay. [CALJIC No.] 8.66. That's the attempt murder. And I think you have to also give 8.66.1.

---

[6] No one disputes that *Canizales* applies here, and we need not address the matter in further detail. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 902, fn. 26 (*Covarrubias*) [as a matter of normal judicial operation, even a nonretroactive decision ordinarily governs all cases pending on direct review when the decision was rendered].) We consider Thompkins's counsel's colloquy with the judge sufficient to preserve any issues relating to the giving of or the wording of CALJIC No. 8.66.1 as modified and given in this case.

"[PROSECUTOR]: Okay.

"MR. BILLUPS: Which one?

"[PROSECUTOR]: The kill zone.

"MR. BILLUPS: Who's the object of—

"THE COURT: It's like when you shoot into a crowd.

"MR. BILLUPS: I understand that on the theory of implied malice. What we're talking about within the kill zone, who's the intended victim?

"THE COURT: Anybody within the kill zone. The zone of risk.

"MR. BILLUPS: It sounds like an implied malice theory of murder as opposed to attempt, as opposed to a specific intent to kill.

"THE COURT: No, there's the intent to kill.

"MR. BILLUPS: You get to implied malice if you shoot into a crowded room.

"THE COURT: So that will be given."

*b. Instructions Given the Jury on Attempted Murder*

On the attempted murder charges, the trial court instructed the jury with CALJIC No. 8.66, which lays out the general elements of attempted murder and, as given, read: "The Defendants Clem Thompkins and Lamar Fox, are accused in counts 3-7 of having committed the crime of attempted murder, in violation of sections 664 and 187 of the Penal Code. [¶] Every person who attempts to murder another human being is guilty of a violation of Penal Code sections 664 and 187. [¶] Murder is the unlawful killing of a human being with malice aforethought. [¶] In order to prove attempted murder, each of the following elements must be proved: [¶] 1.) A direct but ineffectual act was done by one person towards killing another human being; and [¶] 2.) The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being. [¶] . . . . [A]cts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill. The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design."

23

The kill zone instruction given in this case stated: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim either as a primary target or as someone within the kill zone or zone of risk is an issue to be decided by you." The instruction as given was a modified version of CALJIC No. 8.66.1—attempted murder—concurrent intent.

Given the wording of CALJIC No. 8.66, the jury also could have found defendants guilty under that instruction. The question is whether it is clear beyond a reasonable doubt they did not use a kill zone theory in arriving at their actual verdicts.

c.    *Thompkins's Contentions on Appeal*[7]

Thompkins attacks the kill zone instruction on two levels. Most fundamentally, he claims the instruction was improperly given in this case because the evidence did not satisfy the two-part test of *Canizales*. He contends the evidence was insufficient to support a finding that he harbored a specific intent to kill anyone other than the two named victims in the murder charges, Adam and Jenkins. He reaches this conclusion by proposing, without record citation, that Adam and Jenkins were the very same two patrons who engaged with Fox over the neck chain. Building on that supposition, he implicitly suggests the prior scuffle provided the motive for Thompkins to want to kill them, and because the scuffle did not involve the other injured victims, there was no evidence showing intent to kill those individuals, either as individuals or as occupants of the kill zone. He seems to define the "kill zone" as the area in the immediate vicinity of the doorway and goes to some length to argue that the various injured victims were not within the kill zone.

---

[7] Fox joined in Thompkins's briefing on this issue but did not brief it separately.

24

Secondarily, he claims that even if a kill zone instruction was warranted, the wording of this particular instruction made it erroneous under *Canizales*. It required only that the jurors find it "reasonable to infer" that Thompkins intended to kill everyone in the zone of fatal harm, whereas *Canizales* held such an inference must be the "*only reasonable inference*" before the kill zone theory of concurrent intent to kill may be employed or an instruction given. (*Canizales*, *supra*, 7 Cal.5th at p. 597, italics in original.)

### d. A Kill Zone Instruction Should Not Have Been Given

*Canizales* clarified that a kill zone theory cannot be used unless (1) the defendant has a primary target, (2) the defendant harbors the intent to annihilate everyone within the kill zone in order to make sure he or she kills the primary target, and (3) the alleged victim of the attempted murder was inside the kill zone. (See *Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.) This case simply was not tried as a kill zone case. The prosecution did not attempt to define the "kill zone" as encompassing any area smaller than the entire restaurant at trial, yet there was clearly no effort by Thompkins to kill everyone in the restaurant. He fired 10 shots, but there were more than 10 people inside, making the idea that the entire restaurant was the kill zone untenable.

The prosecution never attempted to identify any particular target victim or victims. To say that Adam and Jenkins were the targets (as Thompkins now does) merely because they ended up being killed is to superimpose a specificity not supported by the evidence. It would require us to assume that Thompkins knew exactly which men had confronted Fox and that Thompkins was an accurate marksman and killed exactly whom he intended to kill. True, he was firing at close range, but we do not believe there was sufficient evidence to establish that Adam and Jenkins were the same men who scuffled with Fox in the doorway to Sweet Jimmie's, or that Thompkins specifically targeted them for any other reason. In the absence of such proof, a kill zone instruction was unwarranted either before or after *Canizales*. (*Canizales*, *supra*, 7 Cal.5th at pp. 596-597, 606-607, 609-610; *Stone*, *supra*, 46 Cal.4th at pp. 137-138.)

The Attorney General agrees the kill zone instruction should not have been given, but claims it was harmless error. Citing *Stone*, *supra*, 46 Cal.4th 131, he claims the case law even before *Canizales* was decided already firmly established that a defendant who shoots indiscriminately into a crowd, intending to kill someone—but no particular person—is criminally liable for attempted murder without resort to a kill zone instruction. (*Stone*, at pp. 137-139.) He claims that is what happened here; the kill zone instruction should not have been given (*id*. at pp. 140-142) but was superfluous.

*Stone* involved a defendant who fired a single shot at a group of rival gang members at a distance of four to five feet, where there was testimony that he may have been pointing his gun at the group, as well as testimony that he may have been pointing it over their heads, trying just to scare them. (*Stone*, *supra*, 46 Cal.4th at p. 135.) Although the opinion does not indicate whether anyone was injured, the defendant was charged with attempted murder of one person, Joel F. (*Id*. at p. 136.) Stone was convicted of one count of attempted murder by a jury which had been given a kill zone instruction modeled on CALCRIM No. 600. (*Stone*, at pp. 135-136, 138.) The Court of Appeal reversed, holding not only that giving the instruction was reversible error, but that the evidence was insufficient to support a charge of attempted murder, and retrial was barred. (*Id*. at p. 135.)

The Supreme Court reversed the Court of Appeal, agreeing that a kill zone instruction was not warranted, but holding that the evidence was not insufficient to support an attempted murder conviction. (*Stone*, *supra*, 46 Cal.4th at pp. 136-141.) As the Supreme Court made clear, such a shooting, if accompanied by intent to kill, is sufficient to support an attempted murder verdict, at least on behalf of one person, where one shot was fired.[8] (*Id*. at pp. 134, 140-141.) The Supreme Court held that just because

---

[8] One of the analytical difficulties with the *Stone* theory of attempted murder is determining *how many* attempted murder convictions will be justified if a defendant shoots into a crowd of people with intent to kill, not limited to one particular person. (*Stone*, *supra*, 46 Cal.4th at pp. 140-141.) While *Stone* acknowledged the theoretical problem, it found no difficulty with the notion that a single conviction for attempted

the prosecution could not prove Stone intended to kill the particular person named in the information did not mean he was not guilty of attempted murder. "The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being."[9] (*Id*. at p. 134.) Under *Stone*, there can be no doubt the evidence in the present case was sufficient to support an attempted murder verdict for each of the injured victims. (*Id*. at pp. 137-141.)

Thompkins argues he only exhibited, at most, "conscious disregard of the risk that others may be seriously injured or killed" toward the victims who were not killed, and not actual intent to kill all five wounded victims. But under *Stone* it could be found, without assistance of the kill zone theory, that he intended to kill someone in the crowd—anyone who got in the way of his bullets—and thus attempted to murder each of those victims. In that case, under *Stone*, he would be guilty of attempted murder of all five injured

---

murder could stand for the one named victim. (*Id*. at p. 141.) Likewise, whatever the theoretical and practical limits of the doctrine, the reasoning of *Stone* at least would justify five attempted murder convictions in this case. (See *People v. Medina* (2019) 33 Cal.App.5th 146, 156 (*Medina*).)

The evidence at trial showed an indiscriminate shooting into a crowded room, which under *Stone's* analysis could make Thompkins guilty of multiple attempted murders if it were shown that he harbored an intent to kill indiscriminately. (*Stone*, *supra*, 46 Cal.4th at p. 140.) He could at least be found guilty of attempting to murder the five victims he wounded when 10 shots were fired. Whether he could have been convicted of additional counts for patrons in Sweet Jimmie's who were not hit by bullets is a question we need not confront. (*Id*. at p. 141; see *People v. Perez* (2010) 50 Cal.4th 222, 224, 232, 234 [Supreme Court reversed seven of eight attempted murder convictions based on defendant's firing a single shot from 60 feet away into a group comprised primarily of police officers standing in close proximity to one another because the nature and scope of defendant's attack had not created a zone of fatal harm].)

[9] The jury was not given a pinpoint instruction specifically outlining the *Stone* theory of liability for attempted murder. The jury was not told, for instance, "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone*, *supra*, 46 Cal.4th at p. 140.)

victims.  (*Stone*, *supra*, 46 Cal.4th at pp. 134, 137-141.)  We do not believe, as Thompkins suggests, that *Canizales* superseded *Stone* on this point.[10]

e. *The Error Was Prejudicial Under People v. Aledamat (2019) 8 Cal.5th 1*

The evidence presented at trial was not exclusively probative under the erroneous kill zone instruction.  It was also probative of intent to kill each person who got in the way of one of Thompkins's bullets.  Under *Stone*, such intent to kill could be inferred from the weapon Thompkins chose to use, the number of shots fired, the manner in which he fired, and the circumstances under which he fired, including his proximity to his victims.  "[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime.  [Citation.]  'There is rarely direct evidence of a defendant's intent.  Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]  The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' "  (*People v. Smith* (2005) 37 Cal.4th 733, 741; see also *Canizales*, *supra*, 7 Cal.5th at pp. 602, 607.)

Based on the foregoing analysis, there was sufficient evidence to support all five attempted murder convictions under *Stone*, without a kill zone instruction.  (*Stone*, *supra*, 46 Cal.4th at pp. 140-141.)  Indeed, this may be the theory under which the jury convicted the defendants—that the characteristics of Thompkins's attack showed he

---

[10] *Canizales* cites *Stone* repeatedly with no indication of disagreement. (*Canizales*, *supra*, 7 Cal.5th at pp. 604, 608.)  We think *Canizales* and *Stone* work hand-in-hand to clarify the kill zone theory and to describe liability for partially unsuccessful attempts at mass murder.  *Stone* establishes that the kill zone theory cannot be used when the defendant fires indiscriminately at a crowd of people, not aiming to kill anyone in particular, but hoping to kill as many as possible.  (*Stone*, *supra*, 46 Cal.4th at p. 140.) *Canizales* reinforces that the kill zone theory requires identification of an intended target. (*Canizales*, at pp. 607-608.)  Notwithstanding the inapplicability of the kill zone theory, *Stone* clarifies that one who shoots at a crowd intending to kill indiscriminately does commit attempted murder.  (*Stone*, at p. 140.)

intended to kill as many people as he could inside Sweet Jimmie's, regardless of whether they were among those who were involved in the confrontation with Fox. If so, the convictions would be valid under *Stone*.[11] The Attorney General argues there was "overwhelming" evidence that defendants were guilty of attempted murder under a *Stone* theory. Therefore, he suggests, the kill zone instructional error was harmless, even under the rigorous *Chapman* standard.

The Attorney General points out that a *Stone* theory of attempted murder (indiscriminate shooting into the bar) was argued by the prosecutor more prominently than the kill zone theory. At one point in closing argument, however, the prosecutor said, "The intent was to kill whoever was inside in the line of fire.[12] This is sometimes referred to as a kill zone." That was a faulty description of the kill zone theory, for the kill zone theory *requires a specific murder target*. (*Canizales*, *supra*, 7 Cal.5th at p. 609; *People v. Mariscal, supra,* 47 Cal.App.5th at pp. 137-138; *Medina*, *supra*, 33 Cal.App.5th at pp. 155-156.) The prosecutor described a *Stone* theory of attempted murder, but connected it up to the kill zone jury instruction. That misleading argument

---

[11] The fact that there was a solid evidentiary basis for five attempted murder convictions does not mean, however, that the instructional error was harmless, as the Attorney General suggests. In *Stone* the trial court had given a kill zone instruction, which the Court of Appeal found to be both erroneous and prejudicial. It also found there was insufficient evidence to convict Stone of attempted murder, which precluded a retrial. (*Stone*, *supra*, 46 Cal.4th at pp. 135-136.) It appears to be this latter finding against which the Supreme Court intended to lodge its criticism, for it agreed with the Court of Appeal that the kill zone instruction should not have been given. (*Id*. at p. 138.) What was true in *Stone* is also true here: "The kill zone theory simply does not fit the charge or facts of this case." (*Ibid*.; see also *Medina*, *supra*, 33 Cal.App.5th at p. 156.)

[12] The prosecutor was right in theory. A jury can reasonably conclude a defendant without a primary target who repeatedly shoots at close range into a crowd with a semiautomatic assault rifle harbors the intent to kill. If the jury so infers, the defendant commits multiple counts of attempted murder under a *Stone* rationale. (See *Medina*, *supra*, 33 Cal.App.5th at p. 156.) Though we reverse all five attempted murder convictions, there is no reason why those counts could not be retried without reliance on the kill zone theory (or with appropriate evidence to support it) if the district attorney so elects.

invited the jury to employ the kill zone instruction where no specific target had been identified. This argument reinforced the prejudicial potential of the kill zone instruction itself.

When both a correct and an incorrect instruction have been given, to determine whether the instructional error requires reversal, we apply *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*). There, the defendant was on trial for assault with a deadly weapon (§ 245), and jurors were given both correct and incorrect alternative instructions; they were told that a weapon "could be *either* inherently deadly or deadly in the way defendant used it." (*Id.* at p. 6.) Because the weapon there involved—a box cutter—was not an inherently deadly weapon as a matter of law (*ibid.*), the first part of the instruction was erroneous, but the second part was correct. (*Id.* at p. 7.) The question before the Supreme Court was whether the error was prejudicial in circumstances where there was nothing in the record to show which theory the jury employed in finding Aledamat guilty, but there was plenty of evidence to convict him of use of the box cutter in a deadly manner. (*Id.* at pp. 13-15.)

The Supreme Court first analyzed whether the erroneous instruction was "factually inadequate" or "legally inadequate." (*Aledamat*, *supra*, 8 Cal.5th at p. 7.) A " ' "*factually* inadequate theory" ' " is one that is "incorrect only because the evidence does not support it." (*Ibid.*, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1128 (*Guiton*).) A " ' "*legally* inadequate theory" ' " is one "incorrect because it is contrary to law." (*Aledamat*, *supra*, 8 Cal.5th at p. 7.) In *Aledamat*, the Supreme Court determined the inadequacy was legal because prior case law had established that a box cutter, designed for a utilitarian purpose, is not, as a matter of law, an *inherently* deadly weapon. (*Id.* at p. 6.)

In assessing prejudice, *Aledamat* considered the likelihood that the jurors would have applied the erroneous instruction, not simply the strength of the evidence to support a guilty verdict using the correct instruction. (*Aledamat*, *supra*, 8 Cal.5th at pp. 13-15.) This focus on the impact of the erroneous instruction rather than the strength of the

evidence of guilt is central to *Aledamat*'s reasoning on prejudice. This is not the type of error that can be rendered harmless by "overwhelming" evidence of guilt alone.

We deal here with an instruction that was both legally and factually inadequate. It was legally inadequate because it failed to accurately describe the "kill zone" theory as clarified by *Canizales*. It was factually inadequate because it described a theory of liability that was inapplicable to the facts as established at trial.

The Attorney General concedes the instruction was factually inappropriate, but he fails to acknowledge its legal inadequacy. The instruction included: "the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity." This watered down the requirement under *Canizales* that the inference of intent to kill all those in the target's vicinity must be the "only reasonable inference" that could be drawn from the evidence. (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.) The instruction in this case thus gave the jury a potential short-cut for reaching a guilty verdict on counts 3 through 7.

When legal inadequacy is involved, *Aledamat* holds: "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) In so holding it rejected a more demanding standard of review, advocated by the defendant, that would have required the court to examine the verdict and the record and to find evidence in the record to support a determination, beyond a reasonable doubt, that the jury actually relied on the valid, not the invalid, theory. (*Id*. at p. 9.) The Supreme Court held such a course is not required. It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict. (*Id*. at pp. 10, 12.)

As we understand the standard of review, the question is not whether we think it clear beyond a reasonable doubt that the defendants were actually guilty of five attempted murders based on the valid theory, but whether we can say, beyond a reasonable doubt, the jury's actual verdicts were not tainted by the inaccurate jury instruction. We focus on

the likelihood that the jury relied on the kill zone instruction in reaching its verdicts, not simply the likelihood of defendants' guilt under a legally correct theory.

Under that standard of review, the error was prejudicial in this case. We cannot tell whether the jurors' reasoning proceeded in accordance with the inferences allowable under *Stone* and CALJIC No. 8.66, or whether the jurors instead relied on some version of the kill zone theory that failed to comply with *Canizales*. (See *Canizales*, *supra*, 7 Cal.5th at pp. 612-615 [*Chapman* standard applies].) We cannot say beyond a reasonable doubt that some jurors, at least, did not rely on the faulty element of the kill zone instruction. Therefore, under the guidance of *Aledamat*, we must reverse the convictions on counts 3 through 7 and the related enhancement findings.

## 2. *People v. Chiu* (2014) 59 Cal.4th 155: Changes in Indirect Accomplice Liability[*]

After Thompkins and Fox were convicted and sentenced, the Supreme Court held in *Chiu*, *supra*, 59 Cal.4th 155 that an aider and abettor cannot be held liable for first degree murder on a natural and probable consequences theory. (*Id*. at pp. 158-159.) A conviction of an accomplice for premeditated murder must be based on direct aiding and abetting. (*Id*. at pp. 158-159, 166.) Under *Chiu*, to be convicted as a direct aider and abettor, the accomplice must share the perpetrator's intent in committing the murders; but if he intended only to participate in a lesser offense that evolved into murder, he is guilty of murder only under the natural and probable consequences doctrine. (*Id*. at p. 165.) In the latter case, *Chiu* held, he is guilty of second degree murder, even if the killer was guilty of first degree murder. Because it could not be determined which theory the jury in *Chiu* relied upon, the Supreme Court gave the People the option of either accepting a reduction of the conviction to second degree murder or retrying the defendant for the greater offense on a direct aiding and abetting theory. (*Id*. at p. 168.) If the record had shown the jury found the accomplice harbored the intent to kill, then the natural and probable consequences doctrine would not have come into play, and any instructional error would have been harmless. (*Id*. at pp. 164-166.) If it is not possible to tell beyond a

---

[*] See footnote, *ante*, page 1.

reasonable doubt which theory the jury adopted, the first degree murder conviction cannot stand under *Chiu*. (*Ibid*.; see *Aledamat*, *supra*, 8 Cal.5th at p. 12; *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1357 [beyond-a-reasonable-doubt standard applies to *Chiu* error].)

Fox argues he is in the same position as Chiu, and his first degree murder convictions must be reduced to second degree. As in *Chiu*, the court instructed on both theories. Fox asserts that the prosecutor argued almost exclusively the natural and probable consequences and uncharged conspiracy theories. The Attorney General concedes error but contends the error was harmless in light of the jury's special-circumstance finding. We agree.

The jury found true a multiple-murder special-circumstance allegation against both Fox and Thompkins because they were convicted of more than one murder within the meaning of section 190.2, subdivision (a)(3). Under subdivision (c) of that statute, one who did not actually kill can only be subjected to a special-circumstance penalty if he or she intended to kill.[13] (See *Covarrubias, supra,* 1 Cal.5th at pp. 928-929; CALJIC Nos. 8.80.1, 8.81.3.)

Accordingly, the jury was instructed with a modified version of CALJIC No. 8.80.1, which read in pertinent part: "If you find that a defendant was not the actual killer of a human being, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant *with the intent to kill* aided, abetted, counseled, commanded, induced, solicited, requested, or

---

[13] "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (c).)

assisted any actor in the commission of the murder in the first degree."[14]  (Italics added.)  The prosecutor also reinforced in closing argument that the jury must find Fox had an intent to kill in order to find the special circumstance true as to him.

Thus, the true finding on the multiple-murder special circumstance for Fox implicitly included a finding that Fox harbored an "intent to kill," which made him a direct aider and abettor.  (*Chiu*, *supra*, 59 Cal.4th at pp. 164-166.)  We can therefore say with confidence the jury did not rely on the natural and probable consequences doctrine, *Chiu*'s analysis does not apply, and no remedy is mandated.  (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1144-1146 (*Anthony*) [evidence that defendants were direct aiders and abettors, including multiple-murder special-circumstance finding of intent to kill, rendered *Chiu* error harmless]; cf. *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 418-420 [where jury's felony-murder special circumstance finding included that the defendant had been a "major participant in the crime," defendant was not entitled to relief under Sen. Bill No. 1437].)

Defendants insist the prosecutor presented "exclusively" a natural and probable consequences theory to the jury and never argued direct aiding and abetting.  That is not factually supported by the record.  The prosecutor's very first argument in summation was as follows:  "Your Honor, counsel, ladies and gentlemen of the jury, the defendants, Clem Thompkins and Lamar Fox, left a trail of carnage and destruction in their wake on the morning of April 25th, 2011, when, after obtaining an assault rifle from defendant Fox's residence, they set out to hunt down rival gang members.  Instead, they found innocent victims.  And after a confrontation initiated by Fox, defendant Thompkins took

---

[14] Fox argues that the instruction was inadequate and contradictory because it omitted an express statement contained in the pattern instruction:  "If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true."  (CALJIC No. 8.80.1.)  Although the instruction might have been more comprehensive if that sentence had not been omitted, its omission was not materially misleading and did not negate the fact that the jury was instructed that it must find Fox intended to kill before finding the special circumstance true if he was not the actual killer.

the assault rifle, walked to the front of Sweet Jimmie's and fired multiple gunshots into the restaurant. The goal was clear: To kill. And that is exactly what happened. Two dead, five wounded." Through this "hunt[ing] down" language,[15] we believe the jury would have understood this as an argument for finding Fox guilty on a theory of direct aiding and abetting.

After discussing Thompkins's liability for premeditated murder, the prosecutor turned to Fox's liability, explaining to the jury "two types of aiding and abetting," first, "when somebody helps someone commit an intended crime." He gave as an example a planned bank robbery in which one participant went inside the bank and another one drove the getaway car. Both robbers would be guilty. These were arguments in support of direct aiding and abetting. The second type of aiding and abetting, he said, is "when someone helps someone commit the intended crime and the person he helps commits another crime that . . . was a natural and probable consequence of the intended crime." The prosecutor also argued an uncharged conspiracy theory, and the jury was instructed on that theory. Thus, the prosecutor presented to the jury both direct and indirect aiding and abetting theories, the jury was instructed on both, and Fox cannot prevail on a *Chiu* theory on the basis that the state never sought a murder verdict on a direct aiding and abetting theory.

We further believe the verdict, combined with the jury instructions, shows that the jury convicted Fox on a direct aiding and abetting theory. By finding the special circumstance true as to Fox as alleged in count 2, the jury signaled its finding that Fox intended to kill even before Thompkins fired a shot. That being the case, the jury found him guilty of first degree murder.

Fox argues that the jury was also required to have found separately that he premeditated and deliberated Thompkins's murderous rampage before the *Chiu* error may

---

[15] The prosecutor also made an argument comparing defendants to duck hunters, only they were "hunting human beings." The idea was that (as in *Stone*), the defendants didn't care which duck they killed, they just wanted to kill a few ducks.

be deemed harmless. We disagree that there must be an express finding on those elements. The jury necessarily found that Fox personally acted with "intent to kill" when it found the multiple-murder special circumstance on count 2 true with respect to Fox. In the circumstances of this case, that finding implicitly included a finding of premeditation and deliberation.

The jury's finding of intent to kill could only have rested on Fox's conduct and conversation long before the shooting actually took place, while he and Thompkins discussed killing Acorn gang members in the car, while he went into his house to retrieve the murder weapon, when he instigated a confrontation in the doorway to Sweet Jimmie's, and finally, when he signaled to Thompkins. This relatively lengthy period of discussion and planning certainly gave the jury a factual basis for finding premeditation and deliberation. "It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.)

The jury's true finding on the special circumstance established all that was required to hold Fox liable as a *direct* aider and abettor. The holding of *Chiu* applies only to *indirect* aiders and abettors. *Chiu* had no impact on the liability of direct aiders and abettors. (*Chiu*, *supra*, 59 Cal.4th at p. 166, citing *People v. McCoy* (2001) 25 Cal.4th 1111 as a case setting forth "direct principles" of aiding and abetting liability; *McCoy*, at p. 1118 [direct aider/abettor liability for first degree murder would exist where the aider and abettor "know[s] and share[s] the murderous intent of the actual perpetrator"].) As with the similar changes wrought by Senate Bill No. 1437, discussed *post*, in part III.A.5, "[o]ne who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135, review granted Mar. 18, 2020, S260598 [Sen. Bill No. 1437].) Under *Chiu*, a first degree murder conviction may stand if the defendant was a direct aider and abettor. (*Chiu*, *supra*, 59 Cal.4th at p. 167 [a direct aider and abettor "acts with the mens rea required for first degree murder"].) The instructional error under

36

*Chiu* was harmless beyond a reasonable doubt as to Fox.[16] (*Chapman*, *supra*, 386 U.S. at p. 24; *Chiu*, *supra*, 59 Cal.4th at pp. 164-166; see also *Covarrubias*, *supra*, 1 Cal.5th at p. 902, fn. 26.)

Fox argues we should ignore the jury's implicit finding of his personal intent to kill because the jury instruction on the special circumstance was "self-contradictory." The multiple-murder special-circumstance instruction included that the special circumstance "does not include as an element an intent to kill." The instruction continued, however: "If you find a defendant was not the actual killer of a human being, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested or assisted any actor in the commission of the murder in the first degree." We do not consider this to be self-contradictory. The instruction meant, as a general matter, intent to kill is not an element, but there is an exception for a nonkiller, as to whom such intent is required. It is not reasonably probable the jury misunderstood or was misled by the instruction. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 [test of instructional error is "whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice' "].) We will neither upset the jury's finding on the special circumstance nor disavow its impact on the *Chiu* error.

In supplemental briefing filed in September 2019, Thompkins argued that *Chiu* also applied to reduce *his* legal liability because Fox confessed at sentencing to being the shooter and insisted Thompkins was not. Thompkins therefore asserts that he, too, was a nonkiller entitled to the relief provided by *Chiu*. We cannot accept Fox's confession as true, and we reject Thompkins's argument as specious. We adopt Judge Nakahara's credibility determination as our own and reject Thompkins's argument based on any

---

[16] Because we reject Fox's *Chiu* argument, we also reject his contention that his multiple-murder special-circumstance finding and the accompanying LWOP sentence must be vacated.

interpretation of the evidence that he was not the shooter. *Chiu* applies only to nonkillers convicted on a natural and probable consequences theory; it does not apply to killers. *Chiu* does not apply to Thompkins.

### 3. *People v. Elizalde* (2015) 61 Cal.4th 523: Defendants' Admissions of Gang Membership at Jail Intake[*]

*a. Background*

When Thompkins and Fox were booked into jail, they both were asked if they had any gang affiliation, and both admitted they belonged to Lower Bottoms. Kirven Blaylock, an Alameda County Sheriff's Deputy, testified that when he checked Thompkins into jail following his arrest on June 15, 2011, Thompkins admitted he was a member of Lower Bottoms. Blaylock testified that jail personnel make such inquiries so the jail can separate members of rival gangs for their own safety. Deputy Daniel Pischke testified to Fox's admission of gang membership when he was booked into jail after his arrest in May 2011. Officer Valle testified Fox had admitted gang membership at jail intake. With respect to Thompkins, Valle testified he had admitted gang membership on "numerous occasions" when being booked into jail, as well. Both defendants argue their admissions of gang membership should not have been allowed into evidence because the statements were not preceded by *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436.)

*b. The Error Under Elizalde Was Harmless Beyond a Reasonable Doubt*

This argument has merit under *Elizalde*, *supra*, 61 Cal.4th 523, decided while this appeal was pending.[17] *Elizalde* held that answers to booking questions designed to elicit

---

[*] See footnote, *ante*, page 1.

[17] Defendants also claim their attorneys were ineffective for failing to object to the admissions of gang membership. Because we address the merits of their *Elizalde* claims, we do not reach their allegations of ineffective assistance of counsel. Defendants are entitled to the benefit of *Elizalde* because their case was not yet final on appeal when the opinion issued. (*Griffith v. Kentucky* (1987) 479 U.S. 314, 322, 328; *Covarrubias*, *supra*, 1 Cal.5th at p. 902, fn. 26; *People v. Guerra* (1984) 37 Cal.3d 385, 400; *In re Estrada* (1965) 63 Cal.2d 740, 747-748.)

gang affiliation are subject to exclusion if not preceded by *Miranda* advisements. (*Id.* at pp. 531-532, 538-539.) The Attorney General agrees the admission of this testimony was error under *Elizalde*.

But under *Elizalde*, reversal is not required if the statements admitted were harmless beyond a reasonable doubt. (*Elizalde*, *supra*, 61 Cal.4th at p. 542.) There was strong evidence of gang membership in this case, strong enough to render the testimony about defendants' admissions of gang membership harmless under the *Chapman* standard. (*Chapman*, *supra*, 386 U.S. at p. 24; cf. *People v. Roberts* (2017) 13 Cal.App.5th 565, 577.)

Officer Valle testified that both Thompkins and Fox were members of the Lower Bottoms gang and the 30 Gang subset on the day of the Sweet Jimmie's shooting. At least with respect to Thompkins, Valle's opinion was not based solely, or even primarily, on Thompkins's admissions. Valle had "previously investigated Mr. Thompkins for several different gang crimes in West Oakland." Valle based his opinion that Thompkins was a member of Lower Bottoms on multiple factors: "I've known Mr. Thompkins for several years. I've conducted numerous surveillances in the Lower Bottoms area, specifically the Center Street area, and I've observed Mr. Thompkins within that gang turf on numerous occasions throughout the years. I've also known Mr. Thompkins has self-admitted on numerous occasions to Santa Rita jail classifications that he is a Lower Bottoms gang member."[18] "As far back as I can remember I've always known Mr. Thompkins." Valle then described Thompkins's gang tattoos and continued, "Additionally, I know through my own surveillances and other police reports Mr. Thompkins has been in the presence in Lower Bottoms gang turf and just outside the Lower Bottoms gang turf with other Lower Bottoms gang members." Nelson, too, testified that Thompkins and Fox were members of Lower Bottoms and the 30 Gang

---

[18] We acknowledge the statement regarding Thompkins's self-admissions was inadmissible under *Elizalde*.

clique; he called Thompkins the "leader" of Lower Bottoms. He knew this by reputation before he met Thompkins.

With respect to Fox, Officer Valle's personal knowledge was more limited, as he had not met Fox before the Sweet Jimmie's shooting. He based his opinion that Fox was a gang member on (1) his sale of narcotics within Lower Bottoms gang turf; (2) his gang tattoos; (3) his admission of gang membership at jail intake; and (4) his having been arrested in the past with Thompkins. Fox's prior narcotics conviction was proved through court records, independently of the gang expert's testimony. (Evid. Code, § 452.5; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461 (*Duran*).) Nelson also testified that Fox was a member of Lower Bottoms and 30 Gang. And even if Fox was not a gang member, he could have a gang enhancement imposed simply for participating in a crime with Thompkins, a known gang member, if the jury found he committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang" and that he intended to promote, further, or assist "in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at pp. 67-68.)

Defendants' tattoos were also strong evidence of gang membership.[19] Thompkins had the gang tattoos of "Lower" on his right forearm and "Bottoms" on his left forearm and a tattoo on his back of a woman wearing a hat with the letter "B," which signifies Lower Bottoms. On his chest was the tattoo: "God forgives, gangsters don't." Fox also had "Lower Bottoms" tattooed on his arms, with Fox adding "CVG Goon" on his hand, in reference to Campbell Village Gangsters, a subset of Lower Bottoms to which he belonged. Defendants have not claimed that the tattoo evidence was wrongly admitted.[20]

---

[19] Of course, tattoos are generally indelible and could have been acquired long before the events in question. Nevertheless, the jury was free to find the tattoos meaningful evidence of current gang membership.

[20] Thompkins's tattoos were shown to the jury in photographs taken by a police officer after Thompkins's arrest, and the officer testified from personal knowledge about the tattoos. Likewise, Valle's testimony about Fox's tattoos was backed up by photographs.

40

Fox was also wearing a Chicago Cubs baseball cap when he showed up in Sweet Jimmie's doorway.

Finally, the nature of the offense lent itself to a gang-related interpretation. The crime—spraying a crowd of strangers with bullets in a public restaurant—cried out for a gang explanation (or terrorism, which qualifies as gang violence). Nelson in his testimony and Fox in his police interview said the purpose of obtaining the assault rifle and returning to Jack London Square was to look for members of the rival Acorn gang. Unless they were gang members they would not likely have reacted in that manner to Williams's gesturing toward his waistband. The jury could infer from the defendants' involvement in a gang-related crime they were gang members and acted to benefit the gang. Officer Valle testified expressly in response to a hypothetical question that incorporated many of the factors involved in the Sweet Jimmie's shooting that had been established by independent evidence, it was his opinion the four men in the car would have been engaged in a retaliatory act of violence for the benefit of Lower Bottoms. The questions whether the crimes were committed "for the benefit of, at the direction of, or in association with" a "criminal street gang," and further whether Thompkins and Fox had the "specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)) were ultimately left for the jury to decide. (CALJIC No. 17.24.2.)

We find it highly unlikely the jury's gang enhancement findings would have been different if the admissions of the defendants at jail intake had been excluded from evidence. " ' " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " ' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 178-179 (*Garcia*).) There was strong evidence that both defendants were members of Lower Bottoms and 30 Gang and committed their crimes for the benefit of their gang. Given everything else of record pointing to defendants' membership in Lower Bottoms, the admission of their unadmonished confirmation of that fact was harmless beyond a

reasonable doubt.  (*Elizalde, supra,* 61 Cal.4th at p. 542; *Chapman*, *supra*, 386 U.S. at p. 24.)

**4. *People v. Sanchez* (2016) 63 Cal.4th 665: Gang Expert's Testimony to Hearsay**

 *a. Gang Enhancements Charged Under Section 186.22, Subdivision (b)(1): General Principles*

A gang enhancement under section 186.20 et seq., commonly known as the Street Terrorism Enforcement and Prevention Act (the STEP Act), has two elements or prongs—the gang-related crime prong, and the specific intent prong. (*People v. Albillar* (2010) 51 Cal.4th 47, 60, 64-65.)  Under the first prong, the prosecution must show the defendant committed the underlying crime "for the benefit of, at the direction of, or in association with a criminal street gang."  (§ 186.22, subd. (b)(1).)  A "criminal street gang" must have "a common name or common identifying sign or symbol," its members must "individually or collectively engage in, or have engaged in, a pattern of criminal gang activity," and it must have among its "primary activities" the commission of one or more statutorily enumerated offenses.  "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)

A " 'pattern of criminal gang activity' [under the STEP Act] means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" of the offenses listed in 33 subparagraphs of the statute.  (§ 186.22, subd. (e)(1)-(33).)  These offenses have generally been termed "predicate offenses" (although the phrase does not appear in the statute), two or more of which must be proved to have been committed by gang members within a statutorily-defined timeframe to establish the gang as a "criminal street gang." (*Id.*, subd. (e).)  The charged crime may serve as a predicate offense to qualify the gang as a criminal street gang (*People v. Tran* (2011) 51 Cal.4th 1040, 1046 (*Tran*); *People v. Gardeley* (1996) 14 Cal.4th 605, 625, disapproved on other grounds in *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13 (*Gardeley*); *Duran*, *supra*, 97 Cal.App.4th at p. 1457), as may

a prior conviction suffered by a defendant (*Tran*, *supra*, at pp. 1048-1049). Predicate offenses need not be gang-related (*Gardeley*, at p. 610), and proof of a conviction is unnecessary (*People v. Garcia* (2014) 224 Cal.App.4th 519, 524).

Under the second prong of a STEP Act gang enhancement, the prosecution must show the defendant acted with the specific intent to "promote, further, or assist in any criminal conduct by gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 59; § 186.22, subd. (b)(1).) Specific intent " 'is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 567-568.) It was not necessary for the People to prove defendants were members of Lower Bottoms, or even that they specifically intended to promote, further or assist the gang as a whole. What was required was that they specifically intended to "promote, further or assist in any criminal conduct by gang members." (*Albillar*, *supra*, 51 Cal.4th at pp. 67-68.)

Although the standards for the admission of expert testimony have tightened considerably in recent years, it remains true in principle that expert testimony may supply sufficient proof of the gang's primary activities. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323; *Garcia*, *supra*, 46 Cal.App.5th at p. 165.) In accordance with this accepted mode of proof, the prosecution in a STEP Act case usually presents a gang expert to describe for the jury how a group of the defendant's associates qualifies as a "criminal street gang," including a description of their "primary activities" (§ 186.22, subd. (f)) (i.e., commission of crimes identified in certain subparagraphs of § 186.22, subd. (e)), the name or identifying "sign[s] or symbol[s]" of the promoted gang (*id*., subd. (f)), and at least two offenses committed by the defendant or his fellow gang members to show the gang had engaged in a "pattern of criminal gang activity" (*id*., subds. (b)(1), (e) & (f)). That was the approach the prosecution took to STEP Act proof in this case, through Officer Valle.

*b. Officer Valle's Expert Testimony to Support the Gang Enhancements*

Officer Valle was no ivory tower expert. Much of his expertise was gained while working in various gang-related assignments in the Oakland Police Department over his

11-year career. He started as a patrol officer in West Oakland's gang territories, and more recently was assigned to the gang unit (for more than eight years), where he participated in "[i]dentifying violent street gangs throughout the City of Oakland, monitoring their activities and conducting operations to dismantle their activities." He gained additional gang expertise through formal training, conducting hundreds of gang-related investigations, engaging in hundreds of personal interactions with gang members, and exchanging information with other officers while coordinating with them on gang-related investigations. He also personally participated in the investigation of the Sweet Jimmie's shooting.

His testimony included background evidence relating to gangs in general, not limited to Lower Bottoms. For instance, he testified that gang members find personal status within the gang and respect for their gang by waging violence in the company of other gang members, even if the victims of the violence are not rival gang members. He testified gangs thrive on violence because it instills fear in the public and reduces the risk their criminal activities will be reported to the police. All of that testimony passes muster under both *Sanchez* and *Crawford* as nontestimonial background facts gathered from various sources over a period of time. As such, it is admissible under *Sanchez* in support of the expert's opinions. (*Sanchez*, *supra*, 63 Cal.4th at pp. 678, 685.)

Officer Valle also testified about the organization of Lower Bottoms, its rivalry with Acorn, its primary activities, its pattern of criminal gang activity, and its subsets. He identified Lower Bottoms's "primary activities" as murder, attempted murder, assault with a deadly weapon, assault by means of force likely to cause great bodily injury, robbery, sale or possession for sale of controlled substances, carrying a firearm, and illegal possession of a firearm. He also opined that Lower Bottoms had engaged in a "pattern of criminal [gang] activity." (§ 186.22, subds. (b)(1), (e) & (f).)

In response to hypothetical questions, consistent with *People v. Vang* (2011) 52 Cal.4th 1038, 1046, Valle testified that gang members in defendants' position would have intended to assault rival gang members with a firearm and would have understood that a violent gang response, including "shooting to kill," was about to transpire, and that

44

the ensuing crime would have been done for the benefit of their gang. These hypotheticals were "rooted in facts shown by the evidence" (*id*. at p. 1045) under applicable evidentiary principles at the time of trial. At that time, the Supreme Court had authorized the use of hearsay testimony by a gang expert so long as it was reliable. (*Gardeley*, *supra*, 14 Cal.4th at p. 618, overruled in *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13.) This rule has seen a paradigmatic shift in recent years.

### c. Legal Background of Defendants' Contentions

On June 30, 2016, while this appeal was pending, the California Supreme Court issued its opinion in *Sanchez*, *supra*, 63 Cal.4th 665, a pathmarking decision that announced significant changes in the law relating to hearsay testimony by expert witnesses, which in turn made such testimony vulnerable to challenge under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) for the first time. Through supplemental briefing in August 2016, Thompkins and Fox expanded the scope of their evidentiary and constitutional challenges to the expert's testimony based on *Sanchez*, *supra*, 63 Cal.4th 665.[21]

Thompkins contends the gang expert's testimony in the following specific areas was inadmissible hearsay and violated his right of confrontation: (1) the expert's testimony about Lower Bottoms's primary activities, pattern of criminal activity, and the predicate offenses required to support the gang enhancements; (2) Officer Valle's testimony about Thompkins's admissions of gang membership when being booked into jail after his arrest in this case and on prior occasions; (3) Valle's testimony about Thompkins's arrest in 2006 at McClymonds High School for possession of a firearm;

---

[21] On August 8, 2016, after briefing was complete, Thompkins's attorney filed a letter brief citing *Sanchez,* followed closely by a similar letter brief from Fox's counsel. Though purportedly filed as "new authorities" letters, these submissions raised an entirely new issue and were out of compliance with rule 8.254 of the California Rules of Court. We elected to treat the letter briefs as requests for supplemental briefing (*id*., rule 8.200(a)(4)), and we allowed them to be treated as properly filed supplemental briefs. We requested and received responsive briefing from the Attorney General. Counsel for defendants are cautioned not to violate rule 8.254 in the future.

(4) Valle's testimony that Thompkins had on various occasions been found in the company of Lower Bottoms gang members; and (5) Valle's testimony that Thompkins was the victim of a shooting in August 2007, and he failed to cooperate in the police investigation. Thompkins again raised these *Sanchez* issues in supplemental briefing filed September 9, 2019, after Judge Nakahara denied his habeas petition. Fox joined in that briefing.

Fox also asserted a hearsay and confrontation clause issue under *Sanchez* for the first time in supplemental briefing in August 2016, and he raises broad challenges similar to those asserted by Thompkins relating to gang primary activities and predicate offenses, as well as complaints about Valle's testimony concerning Fox's own individual prior conviction information, which Officer Valle may have learned from other officers, police reports, or conviction records, or may have learned in the process of investigating the Sweet Jimmie's shooting. Fox also contends Valle's opinion that the crimes in this case were committed for the benefit of Lower Bottoms was improperly admitted.

Defendants raised no objection at trial on hearsay or confrontation grounds, but that failure did not forfeit the *Sanchez* or *Crawford* issues. (*People v. Perez* (2020) 9 Cal.5th 1, 4 (*Perez*); *People v. Flint* (2018) 22 Cal.App.5th 983, 996-997 (*Flint*).)

### d. The Sanchez Opinion

In *Sanchez*, the Supreme Court laid out a two-step process for handling evidentiary challenges to expert "basis" testimony: first, a traditional hearsay analysis, followed by analysis of whether the hearsay is "testimonial" under *Crawford*, *supra*, 541 U.S. 36. (*Sanchez*, *supra*, 63 Cal.4th at p. 680.) The gang expert in *Sanchez* had never met the defendants and in forming his opinion relied on police reports and court records. (*Id.* at p. 694.) On the first prong of the analysis, *Sanchez* established a new hearsay rule for experts. Before *Sanchez* was decided, cases such as *Gardeley*, *supra*, 14 Cal.4th 605 had allowed experts to testify to "reliable" hearsay on the theory that it was not admitted for its truth, but only to explain the basis for their expert opinions. (*Id*. at pp. 618-619.) Overruling *Gardeley*, the court in *Sanchez* unanimously held such hearsay is, in fact, admitted for its truth, and the correct dividing line between admissible and inadmissible

46

hearsay in this context lies in whether the testimony relates case-specific facts or general background facts. (*Sanchez*, *supra*, at pp. 674-686.) "[A]n expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge." (*Id.* at p. 676.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*)

Within the *Sanchez* framework an expert may still testify generally to the facts underlying his or her opinions. The *Sanchez* "decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's background knowledge and experience are what distinguishes him from a lay witness." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) "Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Id.* at p. 686.) *Sanchez* does allow an expert to testify to case-specific hearsay, however, if the underlying facts are "independently proven by competent evidence or are covered by a hearsay exception." (*Ibid.*)

In the second step of the analysis, *Sanchez* reiterated past United States Supreme Court authority, holding if the hearsay relayed by the expert was testimonial, and if *Crawford*'s exceptions did not apply, it also violated the confrontation clause under *Crawford*. (*Sanchez*, *supra*, 63 Cal.4th at pp. 680, 685, 687-700.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689.) By illustrative contrast, *Sanchez* categorized several items related to the gang expert's testimony as testimonial for *Crawford* purposes. As relevant to this case, the Supreme Court considered statements in written police reports referenced by the gang expert in testifying about the

47

defendant's prior police contacts. (*Sanchez*, *supra*, 63 Cal.4th at p. 694.) *Sanchez* concluded the statements at issue in the reports were testimonial, reasoning that, although the reports were not as formal as an affidavit, they "relate hearsay information gathered during an official investigation of a completed crime." (*Ibid*.)

*e. Officer Valle's Basis Evidence for His Opinions on Gang Activities*

In *People v. Veamatahau* (2020) 9 Cal.5th 16 (*Veamatahau*), the Supreme Court recently clarified the distinction between background facts and case-specific facts for purposes of applying *Sanchez*. The issue there was whether a drug expert offered case-specific or background testimony when he identified pills in the defendant's possession based on their similar appearance to drugs described on a drug identification database. (*Id*. at p. 22.) The Supreme Court held: "The focus of the [*Sanchez*] inquiry is on the information conveyed by the expert's testimony, not how the expert came to learn of such information. Thus, regardless of whether an expert testified to certain facts based on composite knowledge 'acquired from sources too numerous to distinguish and quantify' or if the expert simply looked up the facts in a specific reference as part of his or her duties in a particular case, the facts remain the same. The background or case-specific character of the information does not change because of the source from which an expert acquired his or her knowledge." (*Id*. at pp. 20-21.)

In deciding the information was background information, not case-specific hearsay, the court pointed out that the expert would have employed his " 'special knowledge, skill, experience, training, and education' to (1) select a source to consult, (2) digest the information from that source, (3) form an opinion about the reliability of the source based on [his or her] experience in the field, and (4) apply the information garnered from the source to the (independently established) facts of a particular case." (*Veamatahau*, *supra*, 9 Cal.5th at p. 29.) *Veamatahau* suggests that if an expert employs his or her expertise in evaluating background information before using it to form an opinion, it remains background information even if it originated from a hearsay source and "serve[s] as the basis of the expert's ultimate opinion" about the charged offense. (*Id*. at p. 31, citing Evid. Code, § 805 ["Testimony in the form of an expert opinion that is

otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."].)

An expert may testify to the matter underlying his or her opinion (Evid. Code, § 802) in order to allow the jury to assess the probative value of the opinion. "A jury may repose greater confidence in an expert who relies upon well-established scientific principles. It may accord less weight to the views of an expert who relies on a single article from an obscure journal or on a lone experiment whose results cannot be replicated." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) Gang experts often acquire their expertise by unconventional means other than academic study and research. But the same analysis, applied to the facts before us, suggests that Officer Valle's testimony about the "primary activities" of Lower Bottoms was admissible background information. Valle no doubt acquired his knowledge about Lower Bottoms, its members, activities, and crimes committed by its members, from many sources, not simply by reviewing police reports. Part of his expertise is knowing how to distinguish reliable from unreliable information in the subject area of West Oakland gangs.

Employing the logic of *Veamatahau*, *supra*, 9 Cal.5th 16, 34, we are convinced that Valle did not simply "regurgitate" prior conviction information from another source. As a gang expert, Valle would have organized, mentally at least, information he received, probably from multiple sources, about gang members' activities and convictions. He would have weighed any incoming information against facts already known to him, would have used his expertise to evaluate the reliability of information he received, and would have formed his opinion accordingly. Because whatever information he received was filtered through his expert's lens, he was properly allowed to testify about his resulting opinions (such as whether Lower Bottoms was a "criminal street gang" with qualifying crimes among its "primary activities"). (§ 186.22, subds. (b)(1), (e) & (f).) These are inferential conclusions, not simple historical facts, and as such they may be considered a matter of expert opinion, to which Valle could properly testify. (Evid. Code, § 801.)

Officer Valle referenced at least once the existence of police reports as a source of his testimony, but unlike the expert in *Sanchez* (*Sanchez, supra*, 63 Cal.4th at p. 694), at no point in his testimony did Valle appear to rely exclusively on police reports in testifying about the defendants' criminal histories, gang membership, and their gang's activities. He investigated the Sweet Jimmie's shooting as part of the police department's investigative team and would have learned much about both defendants from various interviews and from sharing information with other officers. It is not accurate to say he relied solely on police reports.

### f. Lower Bottoms's Status as a "Criminal Street Gang" Was Established Without Reliance on Case-specific Hearsay.

#### i. Officer Valle's Testimony About the Gang's "Primary Activities" Was Background Testimony

Officer Valle testified that Lower Bottoms is a criminal street gang under California law and identified Lower Bottoms's primary activities as murder, attempted murder, assault with a deadly weapon, assault by means of force likely to cause great bodily injury, robbery, sale or possession for sale of controlled substances, carrying a firearm, and illegal possession of a firearm. He also testified that Lower Bottoms had engaged in a "pattern of criminal [gang] activity." (§ 186.22, subds. (b)(1), (e) & (f).) This type of background testimony reflecting an expert opinion garnered from multiple sources is admissible under *Sanchez* because it reflects the operation of the witness's expertise. (See *Veamatahau, supra*, 9 Cal.5th at p. 29.) Expert testimony about a gang's "primary activities" is considered background information admissible under *Sanchez*. (*People v. Bermudez* (2020) 45 Cal.App.5th 358, 377 (*Bermudez*), petn. for review pending, petn. filed Apr. 21, 2020; *People v. Blessett* (2018) 22 Cal.App.5th 903, 945 & fn. 1 (*Blessett*), review granted Aug. 8, 2018, S249250 [grant and hold for *People v Perez*, S248730], disapproved on another ground in *Perez, supra*, 9 Cal.5th at p. 14; *Vega-Robles, supra*, 9 Cal.App.5th at p. 411; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174-1175 (*Meraz I*); *People v. Meraz* (2018) 30 Cal.App.5th 768, 781-782 (*Meraz II*), review granted Mar. 27, 2019, S253629 [grant and hold for *People v Perez*, S248730].)

ii. Predicate Offenses and Any Pattern of Activity They Show Are "Particular Events" That Must Be Proved by Independently Admissible Nonhearsay or Hearsay Excepted Evidence

To establish that defendants' gang or its members engaged in a "pattern of criminal gang activity," the prosecution was required to prove that Lower Bottoms gang members had committed at least two predicate offenses. (See *ante*, part III.A.4.a.) The prior offenses proved by the prosecution in this case were on the list of crimes that qualify as predicate gang offenses: murder, attempted murder, felon in possession, robbery and attempted robbery, possession of narcotics for sale, and sale of a controlled substance. (§ 186.22, subd. (e)(2), (e)(3), (e)(4) & (e)(31).)

There is a split of authority whether specific testimony by a gang expert about predicate offenses by members of a gang should be considered admissible background information or case-specific hearsay in STEP Act cases. In *People v. Ochoa* (2017) 7 Cal.App.5th 575 (*Ochoa*), the expert testified that nondefendants involved in the predicate offenses had admitted their gang membership. (*Id.* at p. 582.) *Ochoa* concluded these admissions, testified to by the gang expert, were case-specific. (*Id.* at pp. 588-589.) The court's analysis on this point was as follows: "It seems clear the hearsay at issue in the present case—out-of-court statements by individuals admitting being members of the [gang]—are case-specific hearsay rather than general background information about the [gang]. *Sanchez* gave the following as one in a series of examples of the distinction: 'That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang.' [Citation.] By analogy, that someone admitted being a gang member is also a case-specific fact." (*Ochoa*, at pp. 588-589.)

To the extent *Ochoa* may be read as holding that a gang expert's testimony about predicate offenses is always case-specific hearsay inadmissible under *Sanchez*, the Third

District has expressed disagreement. *Blessett* held such predicate offense testimony about anyone other than the defendant is part of the admissible background testimony that a gang expert may give under *Sanchez*. (*Blessett*, *supra*, 22 Cal.App.5th at p. 945 & fn. 21, review granted Aug. 8, 2018, S249250; see also *Bermudez*, *supra*, 45 Cal.App.5th at p. 377 & fn. 13 [Third District adhered to its own earlier decision in *Blessett*, rejecting the alternative view espoused in *Ochoa*].) *Blessett* concluded that predicate offenses committed by gang members other than the defendants in the case roughly equate to "chapters in the gang's biography" and an expert's testimony about them should be regarded as background information. (*Blessett*, *supra*, at p. 945; see also *Bermudez*, *supra*, at p. 377.)

Blessett reasoned that, under *Sanchez*, facts are only case-specific when they relate to "the particular events and participants alleged to have been involved in the case being tried." (*Sanchez*, *supra*, 63 Cal.4th at p. 676; see *Blessett*, *supra*, 22 Cal.App.5th at pp. 944-945, review granted Aug. 8, 2018, S249250.) Since the two or more predicate offenses could have been committed by any member of the gang (§ 186.22, subds. (e), (f)), proof of this element would not necessarily relate to "the particular events and participants" involved in the underlying trial. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) Thus, when the expert testified about predicate offenses committed by gang members other than defendants, the expert's testimony was background information, not case-specific hearsay. (*Bermudez*, *supra*, 45 Cal.App.5th at pp. 375-377 & fn. 13; *Blessett*, *supra*, at pp. 944-945.)

We take the *Ochoa* view of this issue. Due to the breadth of the gang enhancement statute, it is true that the gang predicate prong may be proved based on the activities of "*particular persons*" not charged with an offense in the case being tried. But the gang predicate is still an element of a charged enhancement (see *People v. Lara* (2017) 9 Cal.App.5th 296, 337), and as such, it puts the defendant in jeopardy just as surely as a charged offense does—in this case, exposing each defendant to a sentence enhancement of up to 10 years (§ 186.22, subd. (b)(1)(C)), and for the nonshooter, eligibility for a sentence of 25 years to life (§ 12022.53, subd. (e)(1)). As an element of a

charged enhancement, it had to be proved true beyond a reasonable doubt. To meet their burden of proof, the People were required to present independently admissible evidence—not merely background testimony provided by an expert, but competent, nonhearsay evidence or evidence subject to a hearsay exception. Because gang predicate activity is an element of a charged enhancement, it does, in our view, place at issue in the case being tried "*particular events*." Nothing in an expert's training or expertise can aid a jury in determining whether these events actually took place, since that issue is purely a matter of historical fact.

### iii. The Predicate Offenses Required to Prove Lower Bottoms Was a Criminal Street Gang Were Established by Independently Admissible Evidence.

Even though some of the gang expert testimony offered here about predicate offenses is case-specific hearsay and should not have been admitted, there remain "two or more" predicate offenses (§ 186.22, subd. (e)) that were established solely with independently admissible evidence.

#### (a) Thompkins's Prior Arrests and Convictions

First, Officer Valle testified about two prior arrests and two prior convictions of Thompkins and one prior conviction of Fox. Defendants' own prior crimes may be used as predicate offenses to establish the "pattern of criminal gang activity," as long as the jury is convinced they are gang members. (§ 186.22, subd. (b)(1), (e) & (f)); *Tran*, *supra*, 51 Cal.4th at pp. 1044, 1048-1049 [§ 186.22, subd. (a)].) Proof of a conviction is unnecessary. (*People v. Garcia*, *supra*, 224 Cal.App.4th at p. 524.) Valle testified that Thompkins had been arrested for possession of a firearm in September 2006 on McClymonds High School campus, and again in June 2007 at an Arco gas station in West Oakland, the latter time in the company of a Lower Bottoms gang member.[22]

Accepting Thompkins's assertion that Valle's testimony was case-specific, he still has not shown *Sanchez* error with respect to the McClymonds gun possession because the prosecution also presented additional firsthand testimony of the officers involved in the

---

[22] Thompkins does not challenge the admissibility of Valle's testimony about the 2007 incident at the Arco station.

2006 incident.  (See *Sanchez*, *supra*, 63 Cal.4th at p. 686.)  Officers Jamaal Hill and William Bergeron, who were involved in arresting Thompkins for the firearm at McClymonds High, also testified about the date and circumstances of the gun possession.

Valle testified that Thompkins's home was searched in November 2007 and narcotics, ammunition, cash and other items were seized, resulting in Thompkins's conviction of possession of heroin for sale.[23]  Although this was case-specific testimony, an officer who conducted the search also testified about the events, including the date of the offense.  Exhibit 19 was Thompkins's conviction record for that offense.  Such records, subject to a special hearsay exception and prepared by public employees, were admissible to prove Thompkins's commission of the underlying offense.  (Evid. Code, §§ 452.5, 1280; *Duran*, *supra*, 97 Cal.App.4th at p. 1461.)  Conviction records in general are not testimonial in nature because they are "prepared to provide a chronicle of some act or event relating to the public employee's duty" and are not "produced to be used in a potential criminal trial or to determine whether criminal charges should issue."  (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [§ 969b packets are nontestimonial]; see also *Meraz I*, *supra*¸ 6 Cal.App.5th at p. 1176, fn. 10; but see *Garcia*, *supra*, 46 Cal.App.5th at pp. 171-172 [conviction records are testimonial when used to prove the date of the prior conviction].)  The jury instructions show this prior offense was among those the jury was invited to consider in making its findings on the "pattern of criminal gang activity" for the gang enhancements.

Officer Valle also testified that Thompkins was arrested and convicted of being a felon in possession of a firearm in October 2009, which in Valle's opinion had been committed for the benefit of Lower Bottoms.[24]  Again, the arresting officer testified about

---

[23] Thompkins is quick to allege these statements were based on police reports and hence were testimonial hearsay inadmissible under *Sanchez* and *Crawford*.  In fact, Thompkins's appellate counsel at oral argument suggested that all of Valle's testimony about gang-related activity was learned from police reports.  The record does not support that contention.

[24] It is unnecessary that the predicate offenses have been committed for the benefit of the gang.  (*Gardeley*, *supra*, 14 Cal.4th at p. 610.)

the date of the offense and the underlying events. The conviction records for that offense were also admitted as exhibits 17 and 18. And though the jury was unaware, Thompkins admitted the alleged prior convictions in court, so we are not concerned about the reliability of the conviction information.

It was not *Sanchez* error to allow Valle to testify about Thompkins's prior arrests and convictions because nonhearsay evidence was also admitted to prove the same predicate offenses. (See *Sanchez, supra*, 63 Cal.4th at p. 686.) Thompkins's own prior convictions, which were supported by admissible evidence, were proof enough of the two predicate offenses necessary to establish a "pattern of criminal gang activity" and to make Lower Bottoms a "criminal street gang" (§ 186.22, subds. (b)(1), (e) & (f)), if the jury believed he was a gang member, and there was overwhelming evidence he was.

(b) Fox's Prior Arrest and Conviction

Valle testified that Fox had been convicted of selling narcotics on Lower Bottoms turf, and Thompkins was with him when he was arrested. The conviction record for that offense was also admitted under a statutory hearsay exception (Evid. Code, § 452.5). The conviction record told the jury everything that Valle told them about the prior conviction, except the details of the arrest (that it was conducted in Lower Bottoms gang territory in the company of Thompkins). But those details were provided by Officer Eric Kim, who conducted surveillance of Fox's hand-to-hand drug transactions in Lower Bottoms territory and testified that Thompkins was present during those sales, and Officer Joel Hassna, who arrested Fox and Thompkins together on January 17, 2009, after the narcotics transaction in question and found a firearm on Fox. Again, in light of the other testimony, there was no *Sanchez* error.

(c) Predicate Offenses by Other Lower Bottoms Gang Members

Officer Valle testified about three sets of predicate offenses by Lower Bottoms gang members, all of which were cumulative to the predicate offenses by Fox and Thompkins. First, Valle testified about a 2006 murder and attempted murder by Lionel Shell, Tonney Killensworth, Mario Hairston and Maurice Johnston. (§ 186.22, subd. (e)(3).) Although there was no evidence Officer Valle was personally involved in

55

arresting or investigating these individuals, he testified about their crimes as predicate offenses. His testimony was backed up by certified conviction records of all four defendants. The conviction records show gang enhancements were imposed on some of the participants. Thus, there was independently admissible evidence of the gang participation in a murder and attempted murder, and the only bit of Valle's testimony that was not so proved was the name of the gang to which they belonged. Even if we assume for purposes of argument that this sliver of Valle's testimony was case-specific hearsay (*Ochoa*, *supra*, 7 Cal.App.5th at pp. 588-589), we cannot say that without its admission defendants were likely to see a better outcome. (*Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Calhoun* (2019) 38 Cal.App.5th 275, 316 (*Calhoun*) [*Watson* standard applied to nontestimonial *Sanchez* error]; *Flint*, *supra*, 22 Cal.App.5th at pp. 1003-1004 [same]; *Ochoa*, *supra*, 7 Cal.App.5th at pp. 584-585, 589 [same].) There was more than enough nonhearsay or hearsay excepted evidence to prove the gang enhancements, and this evidence was less inflammatory than the circumstances of the current offenses.

The second predicate offense by a nondefendant was Anthony Green's possession of a firearm as a convicted felon in 2007. (§ 186.22, subd. (e)(31).) Green's conviction records do not show a gang enhancement was imposed, but Valle had "previously investigated" Green for "robberies and shootings in West Oakland" and was personally involved in arresting him on the weapons offense. He knew Green's moniker and history of his rivalries within the gang. His testimony about the offense and Green's membership in Lower Bottoms was not hearsay. Green's abstract of judgment was also admitted.

The third predicate offense by nondefendants was a second-degree robbery in 2010 by Sammy Standberry and Matthew Thompkins (a cousin of the defendant in this case, who pled guilty to attempted robbery). (§ 186.22, subd. (e)(2).) Those conviction records did not include gang findings. Though the records establish that the named individuals were convicted of robbery and attempted robbery, they do not establish that these two men were members of Lower Bottoms street gang, though Valle testified they were. Valle knew they were Lower Bottoms gang members firsthand based on having

56

"previously investigated both Mr. Standberry and Mr. [Matthew] Thompkins for their involvement in the Lower Bottoms gang along with committing robberies and shootings throughout the west Oakland area." Thus, Valle had personal knowledge of the perpetrators' gang membership, and his testimony was not hearsay, case-specific or otherwise.

The second and third nondefendant predicate offenses, at least, were established without reliance on improper expert hearsay testimony. Even though Valle's evidence of the Lower Bottoms membership of the nondefendants who committed the first set of predicate offenses, it was harmless error under *Watson*. We bear in mind here that the charged offenses also qualify as predicate offenses. (*Tran*, *supra*, 51 Cal.4th at p. 1046.) The jury found Thompkins and Fox guilty of two murders committed together for the benefit of Lower Bottoms. When considered with all the other properly admitted evidence probative of the gang enhancements, the errors in admitting case-specific hearsay were harmless.

#### g. The Rest of the Case-specific Hearsay Was Either Independently Corroborated or Harmless as to Thompkins

##### i. Thompkins's Admissions of Gang Membership at Jail Intake

Officer Valle's testimony about Thompkins's admissions of gang membership while being booked into jail was case-specific hearsay under *Sanchez* because Valle did not personally perform the intake, and it was elicited in this trial specifically to show this defendant's gang membership. Valle went beyond the arrest in this case and testified Thompkins had admitted gang membership "on numerous occasions" when he was booked into jail. We agree with defendants that Valle's hearsay testimony concerning their gang admissions at jail intake was case-specific and therefore inadmissible under *Sanchez*, as it was under *Elizalde*. (See *Vega-Robles*, *supra*, 9 Cal.App.5th at p. 415.) But Deputy Blaylock, who heard Thompkins make the gang admission, also testified. Coming from that witness, Thompkins's gang admission was admissible as the statement of a party opponent. (Evid. Code, § 1220.) Of course, we cannot ignore the *Elizalde* error—which we have already held was harmless beyond a reasonable doubt—but

57

analyzed strictly from a hearsay perspective, Blaylock's testimony was subject to a hearsay exception.

Gang affiliation admissions made at jail intake are not testimonial under *Crawford*. (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1018-1020; see *Elizalde*, *supra*, 61 Cal.4th at p. 532, fn. 7 ["This case in no way implicates the court's *Crawford* jurisprudence."].) Even if the statements were testimonial, though, allowing the deputies' testimony, being a repetition of defendants' own statements, would not be *Crawford* error. Admission of a defendant's own prior statements, under oath or not, does not implicate the confrontation clause. (*Vasquez v. Kirkland* (9th Cir. 2009) 572 F.3d 1029, 1037 [admission of defendant's prior statements is tested under the Fifth Amendment, not the Sixth]; *United States v. Nazemian* (9th Cir. 1991) 948 F.2d 522, 526 [defendant "cannot claim that she was denied the opportunity to confront herself"]; *Laney v. Felker* (C.D. Cal. 2010) 2010 U.S. Dist. Lexis 38803, *20-*23 [collecting cases].)

ii. Police Contacts with Thompkins While in the Company of Lower Bottoms Gang Members

Officer Valle also testified about several occasions when Thompkins was contacted by police in the company of other Lower Bottoms gang members. In August 2007, he was contacted by police in a vehicle stop in East Oakland in the company of another Lower Bottoms gang member. In December 2008, March 2009, and May 2009, Thompkins was contacted or observed by police in West Oakland with other Lower Bottoms gang members. And in August 2009, Thompkins was with another Lower Bottoms gang member, Terrence Clayton, when Clayton was shot. These contacts, which apparently did not result in arrests or convictions, were not the subject of testimony by the officers who actually made contact or conducted surveillance.

There was no testimony that Officer Valle himself made these contacts or observations. We therefore regard these statements as case-specific hearsay and hence *Sanchez* error. Defendants have not demonstrated, however, that the statements were testimonial in nature. Given the scope of Valle's duties in the gang unit, it is entirely possible this information was acquired informally from other officers. It is also possible

58

Valle learned of the contacts through police reports, which are generally considered testimonial (*Sanchez*, *supra*, 63 Cal.4th at pp. 694-697; see also *People v. Meraz I*, *supra*¸ 6 Cal.App.5th at p. 1176, fn. 10), or field identification cards, which may or may not be testimonial in nature (*Sanchez*, *supra*, at pp. 672, 697; see *Meraz II*, *supra*, 30 Cal.App.5th at pp. 781-783).

Ordinarily, the proponent at trial of proffered hearsay—in this case, the People—has the burden of establishing that it is admissible under an exception to the hearsay rule (*People v. Morrison* (2004) 34 Cal.4th 698, 724) and that it is not testimonial (*Ochoa*, *supra*, 7 Cal.App.5th at p. 584, citing *Idaho v. Wright* (1990) 497 U.S. 805, 816 [state has the burden of proof regarding admissibility under confrontation clause]). When there has been no trial objection, and the source of the hearsay has not been developed, it may be impossible to tell whether the hearsay is testimonial or nontestimonial. Whether the burden of proof at trial carries over to require the prosecution to establish the hearsay was nontestimonial on appeal is a matter of some disagreement. Some cases would suggest defendants must bear the burden of showing error on appeal, and a failure to do so means that the unobjected-to error invokes only a *Watson* standard of prejudice. (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1139-1140; *Ochoa*, *supra*, 7 Cal.App.5th at pp. 584-586, 589; but see *People v. Martinez* (2018) 19 Cal.App.5th 853, 860-861 [where there was a combination of testimonial and nontestimonial hearsay error, the reviewing court applied the *Chapman* standard]; *Sanchez*, *supra*, 63 Cal.4th at p. 698.) Regardless of which approach we take, the end result is the same: the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

iii.     Testimony About the Shooting of Thompkins in 2007

Officer Valle testified that in August 2007, Thompkins was shot on Center Street in West Oakland, purportedly by a rival gang member, and Thompkins refused to cooperate with the police investigation. On cross-examination he testified Thompkins had been shot in the back by someone wearing a ski mask. So far as we are aware, there was no corroborating testimony by officers involved in the investigation. This was case-specific hearsay and inadmissible. We do not know how Valle became aware of these

59

facts, though. Valle could have learned about the crime from police reports, in which case the hearsay would have been testimonial. Given his description of his responsibilities on the gang unit and in the investigation of the Sweet Jimmie's shooting, however, it is likely he gained access to this information informally from other officers as part of an ongoing crime-fighting effort or through the investigation of the Sweet Jimmie's shooting, rather than from police reports or other testimonial sources alone. Whichever standard of prejudice we apply—state or federal—we find the error harmless as to Thompkins, about whom there was plentiful admissible evidence of gang involvement.

### h. The Case-Specific Hearsay Was Either Independently Corroborated Or Harmless as to Fox

Officer Valle's testimony and opinion about Fox's gang membership and gang history stand on somewhat different footing because his knowledge was not based on his own participation in previous investigations of Fox. He testified he had never met Fox prior to the Sweet Jimmie's shooting. None of this testimony violated *Sanchez*.

### i. Fox's Admission of Gang Membership at Jail Intake

Officer Valle testified to Fox's admission of gang membership when he was booked into jail after his arrest in May 2011, corroborated by the deputy who actually heard Fox make the admission. Valle's testimony did not violate *Sanchez* because Deputy Pischke's testimony was subject to a hearsay exception. (Evid. Code, § 1220.) We see no *Sanchez* error here.

### ii. Fox's Association with Thompkins

To prove the gang enhancement against Fox, the prosecution sought to prove he was a close associate of Thompkins's, as to whom the gang evidence was stronger. Officer Valle testified, among other things, that Fox and Thompkins had been arrested together in Lower Bottoms territory for a drug offense. Fox claims this was case-specific hearsay. But the conviction itself was proved by conviction records. Moreover, as noted above, Officers Kim and Hassna also testified that Thompkins and Fox were together in Lower Bottoms territory when Hassna arrested them for a drug sale that resulted in Fox's

conviction. None of the information conveyed by the expert's case-specific hearsay about Fox's past criminality went uncorroborated. Therefore, it was not error under *Sanchez*. (*Sanchez*, *supra*, 63 Cal.4th at p. 686.)

### iii. Officer Valle's Ultimate Opinion That the Sweet Jimmie's Shooting Was for the Benefit of the Gang Was Admissible Expert Opinion

Officer Valle's testimony was by no means the sole basis for the jury's finding on the gang enhancement. Nelson also testified that both Thompkins and Fox were Lower Bottoms gang members and members of the 30 Gang subset. Fox and Thompkins spent the day together on Easter 2011, along with Nelson and James. Nelson testified the group retrieved the assault rifle to engage in a preemptive strike against members of the Acorn gang. The foursome's return to Sweet Jimmie's speaks volumes about their anticipation of a gang-related confrontation where the weapon would be used for gang purposes, even if used only defensively in the event of gang warfare. Hence, the firearm's presence itself was for the benefit of the gang's conflict with Acorn, and Fox provided the weapon.

The benefit/direction/association testimony was allowable as the opinion of an expert. By its nature, such testimony is a conclusion drawn from known facts—an opinion—not an ascertainable historical fact. Valle's opinion that Thompkins's Sweet Jimmie's shooting was undertaken "for the benefit of, at the direction of, or in association with" a criminal street gang was properly admitted. Most statements he made as the basis for his opinion either were not hearsay, were supported by testimony from others that was not hearsay, or were supported by admissible criminal records. The expert's opinion that Thompkins's shooting into the bar was for the benefit of his gang was fully supported. And because Fox (1) provided the weapon to Thompkins, (2) spoke with Thompkins in the car about killing Acorn gang members, (3) started a confrontation with the crowd at Sweet Jimmie's, (4) signaled Thompkins when he was ejected from the bar, (5) drove the getaway car, and (6) took back possession of the weapon with a view to disposing of it, he could also reasonably be seen as acting for the benefit of the gang.

iv. The Case-specific Hearsay, Considered Collectively, Was Not Prejudicial Under the *Watson* or the *Chapman* Harmless Error Standard

Though failure to object did not waive the alleged *Crawford* error for appeal (*Perez*, *supra*, 9 Cal.5th at p. 4), some cases have held that, to the extent the failure to object resulted in an inadequate record, the reviewing court will not assume constitutional error, and have applied the *Watson* standard of prejudice. (*Garcia*, *supra*, 46 Cal.App.5th at p. 167; *Anthony*, *supra*, 32 Cal.App.5th at pp. 1139-1140; *Ochoa*, *supra*, 7 Cal.App.5th at pp. 584-586, 589.) Under that view, defendants have not carried their burden of showing *Crawford* error on appeal because they have not shown that any of the challenged hearsay was testimonial. The *Watson* standard applies to nontestimonial *Sanchez* error. (*Calhoun*, *supra*, 38 Cal.App.5th at p. 316; *Flint*, *supra*, 22 Cal.App.5th at pp. 1003-1004; see *Sanchez*, *supra*, 63 Cal.4th at pp. 684-685.) On the other hand, where there is a combination of testimonial and nontestimonial hearsay error, and an adequate record has been made to evaluate the effect of the testimonial aspects of it, the reviewing court must apply the *Chapman* standard. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 698-699; *People v. Martinez*, *supra*, 19 Cal.App.5th at p. 861.) Some aspects of the STEP Act proof that was admitted here do raise potential issues under *Crawford*. The admission of conviction records, for example, may have violated the confrontation clause to the extent they were offered to prove anything other than the fact of each conviction. (*Garcia*, *supra*, 46 Cal.App.5th at pp. 171-172 [under *Kirby v. United States* (1899) 174 U.S. 47, "records of convictions used to prove facts other than the fact of conviction itself *are* testimonial"].) But even assuming federal constitutional error was involved, we find any *Crawford* error that occurred in this trial harmless beyond a reasonable doubt (*Chapman*, *supra*, 386 U.S. at p. 24) in light of the wealth of evidence of gang involvement that was properly admitted. (*People v. Bell* (2020) 47 Cal.App.5th 153, 196-197; *Chapman*, *supra*, 386 U.S. at p. 24.)

We are confident the gang expert in this case assisted the jury in the manner intended under Evidence Code section 801. By weaving together a variety of pertinent evidentiary threads, he made the whole tapestry of defendants' past crimes and other

gang-related conduct more comprehensible and accessible to the jury. The People were entitled to make the best case they could that Thompkins and Fox were not just two mutually protective neighborhood toughs who misjudged a perceived slight from a stranger and overreacted, turning it into a provocation, which led to unspeakable but unplanned violence. Their gang histories, as comprehensively explained by Valle, helped to dispel any such notion. Even if, by prevailing evidentiary standards the proof offered in the People's STEP Act case might have been more discriminating—as we would expect to see in a post-*Sanchez* trial—we have no doubt the jury's verdict on the gang enhancements would have been the same in this case absent any improperly admitted gang-related proof under *Sanchez* or *Crawford*.

**5. Senate Bill No. 1437: Amendments to Sections 188 and 189 on Accomplice Liability**[*]

Fox alone argues that Senate Bill No. 1437, which implemented changes to sections 188 and 189 relating to felony murder and accomplice liability, must be applied retroactively to this case because it is ameliorative legislation made retroactive under *In re Estrada*, *supra*, 63 Cal.2d at page 748. That bill eliminated the natural and probable consequences theory of liability for murder on the part of nonkiller accomplices. (*In re R.G.* (2019) 35 Cal.App.5th 141, 145.) Senate Bill No. 1437 "redefined 'malice' in section 188. Now, to be convicted of murder, a principal must act with malice aforethought; malice can no longer 'be imputed to a person based solely on [his or her] participation in a crime.' " (*In re R.G.*, *supra,* at p. 144, citing § 188, subd. (a)(3).)

While we recognize that the Legislature intended Senate Bill No. 1437 to apply to convictions that occurred prior to its enactment, it established a resentencing petition procedure under section 1170.95 for that purpose. (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220-221; *Anthony*, *supra*, 32 Cal.App.5th at pp. 1147, 1153; *People v. Martinez* (2019) 31 Cal.App.5th 719, 724-730.) We need not delve deeply into Fox's contention, for under section 1170.95, a defendant convicted of murder under the law

---

[*] See footnote, *ante*, page 1.

predating Senate Bill No. 1437 is required to file a petition for relief in the court that sentenced him. (§ 1170.95, subds. (a) & (b); *Martinez*, *supra*, at p. 727.) Fox did not follow that procedure. Accordingly, relief in this court at this juncture is not authorized. (See also *Cervantes*, *supra*, at pp. 220-221; *Anthony*, *supra*, at pp. 1147-1158.)

## 6. Senate Bill No. 620: Firearm Enhancements Under Section 12022.53 Are Discretionary[*]

In a supplemental opening brief filed with permission on March 23, 2018, Fox alleged he was entitled to a remand for resentencing due to amendments to sections 12022.53 and 12022.5, effective January 1, 2018. Thompkins joined in that filing and also raised the same point in his supplemental opening brief filed with permission on September 9, 2019.

On October 11, 2017, the Governor signed into law Senate Bill No. 620, which amended section 12022.53, subdivision (h). Under that amendment a trial court has the discretion to decide whether or not to impose any of the firearm enhancements set forth in section12022.53. Thus, as of January 1, 2018, section 12022.5, subdivision (c) provides that "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." Similarly, section 12022.53, subdivision (h), now provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 2.)

When Fox and Thompkins were sentenced in this case, the imposition of a 25-year-to-life enhancement for violating section 12022.53, subdivision (d) was mandatory, and the trial court had no power to strike or dismiss those sentence enhancements in

---

[*] See footnote, *ante*, page 1.

counts 1 through 7.  (§ 12022.53, former subd. (h).)  Now it has that power.  (§ 12022.53, subd. (h).)

Senate Bill No. 620 is retroactive, and a remand to the trial court for resentencing is appropriate.  (E.g., *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1109; *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1079; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 424-425; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) "Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so." (*Almanza*, *supra*, at p. 1110.)  Although both defendants remain under an LWOP sentence, we will remand the matter for the trial court's exercise of sentencing discretion on the firearm enhancements. The Attorney General concedes a remand is necessary, and we will remand in any event for possible retrial of counts 3 through 7.

## B. MISCELLANEOUS EVIDENTIARY ISSUES[*]

### 1. Thompkins's *Aranda/Bruton* Claim Based on the Admission of Fox's Redacted Interview Statements

*a. The Aranda/Bruton Rule and Thompkins's Claims*

The confrontation clause of the federal Constitution demands, when a nontestifying codefendant's out-of-court statement implicates a defendant, before it may be introduced at a joint trial, it must be redacted to eliminate any reference to the defendant.  (*Bruton*, *supra*, 391 U.S. at pp. 135-136; *Aranda*, *supra*, 63 Cal.2d at pp. 530-531.)[25]  The Supreme Court limited the scope of *Bruton* in *Richardson v. Marsh* (1987)

---

[*] See footnote, *ante*, page 1.

[25] *Aranda* was decided on state statutory grounds.  (*Aranda*, *supra*, 63 Cal.2d at p. 531.)  In 1982, however, the "truth-in-evidence" provisions of Proposition 8 made it co-extensive with *Bruton*.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 465 (*Fletcher*); 5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 429(2), p. 687.)  We are aware of the decisions in *People v. Cortez* (2016) 63 Cal.4th 101, 129, *People v. Gallardo* (2017) 18 Cal.App.5th 51, 68-69, and *People v. Washington* (2017) 15 Cal.App.5th 19, 28, whose holdings make an *Aranda/Bruton* claim viable only to the extent the challenged statement was "testimonial" within the meaning of *Crawford*. (5 Witkin, Cal. Criminal Law, *supra*, Criminal Trial (2019 Supp.) § 429(4), pp. 100-101.)

481 U.S. 200, holding exclusion of a codefendant's confession was not required where the statement was redacted so that it did not incriminate the defendant on its face, but was so understood only when linked with other evidence introduced at trial. (*Id.* at pp. 206-207; *People v. Homick* (2012) 55 Cal.4th 816, 874.) "Statements that incriminate by implication . . . are not within the scope of *Bruton.*" (*People v. Capistrano* (2014) 59 Cal.4th 830, 870; see also *Fletcher*, *supra*, 13 Cal.4th at p. 463; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1046-1047 (*Mitcham*); *People v. Ardoin* (2011) 196 Cal.App.4th 102, 135-138.)

On the other hand, a redaction that merely replaces a defendant's name with an indication that his name was deleted, such as a blank space or the word "deleted," is inadequate because it too clearly invites the jury to infer the "deleted" word was the defendant's name. (*Gray v. Maryland* (1998) 523 U.S. 185, 192, 197.) *Gray* held when, despite redaction, the statement "involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial," the *Bruton* rule has not been satisfied. (*Gray*, at p. 196.)

Of course, effective and fair redaction can pose problems of its own. Codefendants whose out-of-court confessions have been redacted to omit reference to a nondeclarant defendant sometimes raise their own claims on appeal that the redacted version of their statements omitted too much, distorted their testimony, or made their role in the crime appear greater than it really was. (E.g., *People v. Gamache* (2010) 48 Cal.4th 347, 379; *People v. Lewis* (2008) 43 Cal.4th 415, 457-459; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1097-1101.) Therefore, the prosecutor redacting a statement for use at trial, and a trial court approving its admission, must be diligent to protect the rights of both the codefendant who made the statement and the nondeclarant defendant whose identity has been redacted from it. The efficacy and adequacy of the

---

The statements challenged here were made in the context of a formal police interview while Fox was in custody, which makes them testimonial and subject to the challenge raised by Thompkins. (*Crawford*, *supra*, 541 U.S. at pp. 38-39, 53, fn. 4, 68.)

redaction must be decided on a case-by-case basis. (*Fletcher*, *supra*, 13 Cal.4th at pp. 456, 468.)

The version of Fox's statement to the police on June 29, 2011 that was played for the jury had been redacted, but Thompkins contends the prosecution's redaction was inadequate to avoid a violation of the confrontation clause because it did not fully eliminate references to him. Thompkins specifies two points in the DVD at which he claims the jurors would have inferred that Fox had incriminated him.

First, as Fox was recounting being pushed away from the entrance to Sweet Jimmie's, the redacted version says (according to the transcript): "I knew had a weapon in the car, but there wasn't really no need for that." Thompkins's appellate attorney points out the redacted statement omits the name or pronoun of the person or people whom he "knew had a weapon in the car," making it ungrammatical. He claims that, because of this single grammatical clue, the jury would have realized the statement referred to Thompkins having a gun in the car. And although there were three other people associated with the white car, Thompkins claims the jury would have understood the redacted statement as referring to him because other evidence in the case showed the three other men in the car had already exited it, so only Thompkins was left in the car with the weapon.

In addition, Thompkins claims Fox's response to the question whether he was "supposed to get rid of" the assault rifle implies that someone else told him to get rid of it, which in turn acknowledges the participation of others in the crimes, including potentially Thompkins. Thompkins now claims the redacted version was not sanitized sufficiently to avoid violating the rule of *Aranda/Bruton*.[26] Thompkins's trial counsel, however, did not object to the introduction of the statement, and that failure forfeited the issue on appeal. (*People v. Melendez* (2016) 2 Cal.5th 1, 26 (*Melendez*); *Mitcham*, *supra*, 1 Cal.4th at p. 1044.)

---

[26] Fox's trial counsel complained, too, that the redaction left her client looking more culpable than was fair.

*b. The Claimed Aranda/Bruton Error Was Forfeited by Failure to Object*

The prosecutor made an in limine motion seeking admission of Fox's in-custody statements, subject to the limitations of *Aranda*/*Bruton*. When the matter was heard, the prosecutor presented his version of a redacted DVD, together with transcripts showing the redacted material, to which Thompkins's counsel indicated he "may have an objection." He did not, however, further articulate any such objection.

Following that hearing, the prosecutor and Fox's counsel spent some time outside the courtroom working out an agreed-upon redaction, which was to be reviewed by Thompkins's counsel, who would then make any objections at the next hearing. At the next hearing the redacted statement was discussed, the court specifically addressed Thompkins's counsel to solicit any objections, and Thompkins's attorney voiced no objection.

Notably, with respect to the "supposed to get rid of the gun" statement, Fox's counsel expressly wanted this part of the interview to be heard by the jury because she felt it made her client appear less culpable than if he had decided to dispose of the weapon on his own. Although it does not appear in the record, it is safe to assume Fox's counsel also wanted the "I knew had a weapon in the car" sentence to remain in the redacted version because the end of the sentence—"there wasn't really no need for that"—showed Fox thought the incident did not warrant a violent response. The sentence as a whole showed Fox did not bring a gun with him when he exited the car. Thus, it tended to be exculpatory as to Fox. The redacted statement did not implicate Thompkins directly or indirectly without the aid of other evidence, and it balanced the concerns of the various parties.

Thompkins's attorney did not object to the redacted statement as agreed to by the other parties. He also did not object when the DVD was played for the jury or when it was moved into evidence by the prosecutor. Counsel's silence forfeited any issue for appeal. (Evid. Code, § 353; *Melendez*, *supra*, 2 Cal.5th at p. 26; *Mitcham*, *supra*, 1 Cal.4th at p. 1044 [failure to object waives appellate review of alleged error based on *Bruton*].)

68

*c. Any Shortcoming in the Redaction Was Harmless Error*

The first complained-of redaction was the elimination of one word—"we"—in Fox's statement to police that there was a weapon in the car. The fact that several men were in the car together was obvious from the rest of the evidence, and nothing said by Fox in the redacted interview tended to implicate Thompkins in particular, as opposed to any other individual. Instead, it was Nelson's testimony that could have given rise to an inference that it was Thompkins, and not one of the others, who had possession of the weapon in the car and who instructed Fox to get rid of it. In such circumstances, because other evidentiary "linkage" was required to raise an inference that Thompkins was the individual to whom Fox referred in the statement, we need not assume the jury was unable to follow the limiting instruction. (*Richardson v. Marsh*, *supra*, 481 U.S. at pp. 206-210.) We view the complained-of sentence as a fair effort to balance the defendants' competing interests. It did not violate Thompkins's right of confrontation under *Bruton*. Considered in the light of all the evidence at trial and Fox's clear interest in having the sentence included in the redacted DVD, we are convinced beyond a reasonable doubt this statement did not affect the jury's decision on any of its verdicts or findings against Thompkins or deprive Thompkins of his right of confrontation.

Even if Fox's answer to the question whether Fox was "supposed to get rid of" the gun could have been interpreted to mean someone else instructed Fox to get rid of it, and even if the jury might infer it was Thompkins who gave him that order, we could not find inclusion of the statement prejudicial. The jury heard Thompkins say on the phone to Fox, "You and [the rifle] were never supposed to be in the same place. Man. You hear me?" Thompkins's own words were more inculpatory than was Fox's redacted statement. Even if the complained-of redaction was not to Thompkins's liking, in light of the strong evidence of Thompkins's guilt, its admission was harmless beyond a

reasonable doubt.[27]  (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Burney* (2009) 47 Cal.4th 203, 232 [*Chapman* standard applies].)

**2. Thompkins's Claim That Investigator Phillips Should Not Have Been Allowed to Testify That He Believed Nelson Was Telling the Truth**[*]

*a. Background*

George Phillips, a former police officer and the district attorney's investigator, interviewed Nelson in jail and was called to testify for the People.  Nelson told Phillips that Thompkins and Fox drove back to Sweet Jimmie's with a semiautomatic rifle to exact revenge on behalf of their gang and told him Thompkins was the gunman.  Nelson told Phillips that Thompkins had talked about "those bitch ass niggas from the Acorn" after Fox's encounter with Williams at Nation's.  Nelson told Phillips they picked up a gun at Fox's house, and he watched Thompkins get out of the white car carrying that rifle, which Thompkins then fired into Sweet Jimmie's.  Nelson cried as he told Phillips his account of the shooting.

On cross-examination, Fox's attorney emphasized those portions of Nelson's statements, repeated by Phillips, that made Fox appear less culpable than Thompkins.  She got Phillips to reiterate Nelson's statement that Thompkins was the "leader" of the gang, while Fox was a follower, that Nelson was sure Thompkins was the shooter, and that he initially, but falsely, identified Fox as the shooter only because he thought he would be killed if he said Thompkins was the shooter.  Fox's attorney then asked Phillips if he thought Nelson was telling the truth.  Defense counsel for Thompkins objected, but

---

[27] This conclusion would also defeat Thompkins's claim of ineffective assistance of counsel, first raised in his reply brief.  That claim has been waived, but even if we were to address it, we would reject it for lack of prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [lack of prejudice may dispose of ineffective assistance of counsel claim without discussion of performance]; see also *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel raised by defendant for first time in reply brief is forfeited].)

[*] See footnote, *ante*, page 1.

the objection was overruled. Phillips testified he thought Nelson was telling the truth "about everything he had been involved with."

### b. Overruling Thompkins's Objection Was Error, But Harmless

We agree with Thompkins this testimony should not have been allowed. A witness's personal opinion regarding the credibility of someone he does not know well is inadmissible. (*People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40 [police officers' opinion of witness's truthfulness].) Even an expert witness (and Phillips was not testifying as an expert) may not opine on the truthfulness of a party or witness. " 'The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well-equipped as the expert to discern whether a witness is being truthful.' " (*People v. Curl* (2009) 46 Cal.4th 339, 359-360, quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82; see also *People v. Brown* (2016) 245 Cal.App.4th 140, 157-158.)

Allowing this testimony was error but was not prejudicial. The prosecutor made a point of establishing on redirect that Phillips had no way of knowing whether Nelson was telling the truth, which significantly diminished the likelihood the jurors would rely on his opinion. In addition, the jurors were instructed they were "the sole judges of the believability of a witness and the weight to be given the testimony of each witness." (CALJIC No. 2.20.) They were given suggestions in judging a witness's credibility (CALJIC Nos. 2.20, 2.21.2), told how to evaluate discrepancies in the testimony (CALJIC No. 2.21.1), how to weigh conflicting testimony (CALJIC No. 2.22), and how to determine the weight to be given an opinion of a lay witness (CALJIC No. 2.81). We presume they followed these instructions (*Covarrubias*, *supra*, 1 Cal.5th at p. 887), and did not blindly accept Nelson's testimony just because Phillips believed him.

This presumption is bolstered by the fact that the jury requested to review the DVDs of the statements made by Williams and Fox and the phone calls between defendants when Fox was in jail, as well as requesting a readback of Nelson's testimony

about who was involved in the two arguments.  This suggests they were focused on the evidence, not the expert's testimony about the believability of the evidence. They did not request a readback of the expert's testimony. That the jury deliberated nine hours shows the jurors took their fact-finding responsibilities seriously and neither abdicated their role as factfinders, nor allowed themselves to be swayed by Phillips's opinion testimony.

Given the strength of the evidence against Thompkins, there is no reasonable probability the verdict would have been different in the absence of Phillips's endorsement of Nelson's credibility.  (*People v. Melton*, *supra*, 44 Cal.3d at p. 744 [applying *Watson* standard].)  Thompkins claims the error violated his rights to due process, a fair trial, and confrontation of witnesses, thus requiring assessment of prejudice under the *Chapman* standard.  Even assuming that were true, we would still find the error harmless beyond a reasonable doubt in light of the complete charge to the jury and the prosecutor's effort to mitigate any prejudice from the improper opinion testimony.

   *c. There was no prosecutorial misconduct.*

Thompkins claims the evidentiary error amounted to prosecutorial misconduct because a prosecutor must not vouch for his or her witness (*People v. Martinez* (2010) 47 Cal.4th 911, 958; *People v. Anderson* (1990) 52 Cal.3d 453, 479), and Phillips, as the district attorney's employee, did just that for Nelson.  This argument does not move us to grant relief. Thompkins would have us extend the rule applicable to prosecutors to government witnesses testifying on behalf of the prosecution, even if the testimony was elicited by a codefendant's attorney and not by the prosecutor.  Having been presented with no authorities requiring us to do so, we decline the invitation.

## 3. Thompkins's Claim that Nelson Should Not Have Been Allowed to Testify He Heard Thompkins had Given the "Green Light" to Kill Him[*]

Thompkins also claims the judge erred in allowing Nelson to testify he "hear[d]" Thompkins had put a "green light" on Nelson to be killed.  Thompkins claims the evidence violated the hearsay rule and the confrontation clause.  The evidence was not

---

   [*] See footnote, *ante*, page 1.

hearsay at all because it was not admitted for its truth. That a limiting instruction was not given has not been raised as a separate instance of ineffective assistance of counsel.

*a. Background*

Nelson testified at trial that Thompkins was the gunman. However, when he was first interviewed by the police, Nelson told them Fox was the gunman. At trial, Nelson said his earlier statement identifying Fox as the gunman was false, and he lied because "someone" in West Oakland (he could not remember who) told him, on behalf of Thompkins, to say Fox was the shooter. Nelson also testified an unknown person shot at him around Christmas 2011. The following then ensued:

"[PROSECUTOR]: Q. Did you hear that Clem Thompkins had done something with respect to you?

"[THOMPKINS'S COUNSEL]: Again, objection, your Honor.

"THE COURT: It's overruled.

"[THOMPKINS'S COUNSEL]: Did you hear something?

"THE COURT: It's overruled. Make your objection and the basis. No speaking objections.

"[PROSECUTOR]: Q. Did you hear that Thompkins had done something with respect to you?

"[THOMPKINS'S COUNSEL]: Objection, your Honor. It's calling for hearsay, speculation.

"THE COURT: It's too vague.

"[PROSECUTOR]: Q. Did you hear of a specific threat that Clem Thompkins made to you?

"A. Yes.

"Q. And what was that threat?

"A. He said that it was a green light on me.

"Q. What is a green light?

"A. Go ahead and kill me."

73

*b. The evidence was admissible for a nonhearsay purpose*

We review evidentiary rulings only for abuse of discretion.  (*People v. Clark* (2016) 63 Cal.4th 522, 597; *People v. Avila* (2006) 38 Cal.4th 491, 578 (*Avila*).)  The judge did not abuse his discretion in allowing the statement to come into evidence because it was not admitted to show that Thompkins truly did give such a "green light."  Hence, it was not admitted for its truth.  The testimony was admissible because an out-of-court statement not admitted for its truth is not hearsay.  (*Melendez*, *supra*, 2 Cal.5th at p. 26; *Sanchez*, *supra*, 63 Cal.4th at p. 674; *People v. Garcia* (2008) 168 Cal.App.4th 261, 287-288.)

The "green light" testimony was admissible to show Nelson's fearful state of mind, to explain why he did not come to the police earlier, and why he initially named Fox as the shooter.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1313 [third-party threat testimony admissible to show why witness was afraid to testify and to support his credibility, even if threat not tied to defendant]; *People v. Abel* (2012) 53 Cal.4th 891, 925 [same]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084-1085 [same]; *People v. Garcia, supra,* 168 Cal.App.4th at pp. 287-288 [threats causing witness's fear of retaliation are relevant to credibility and admissible as nonhearsay, even in the absence of defendant's connection to any threat].)  Given a legitimate, if limited, basis for admissibility, the court did not abuse its discretion in admitting the evidence.  The prosecutor used the testimony solely to argue it supported Nelson's credibility in explaining why he initially identified Fox as the shooter.  Thus, the state made no improper use of the testimony.

Although a limiting instruction would have been appropriate in these circumstances, the failure to give one was not judicial error.  Such an instruction need only be given if requested by the defense.  The trial court has no sua sponte duty to give a limiting instruction.  (Evid. Code, § 355; *Sanchez*, *supra*, 63 Cal.4th at p. 460; *People v. Smith* (2007) 40 Cal.4th 483, 516; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.)  Defense counsel did not request a limiting instruction, and Thompkins does not contend this was ineffective assistance of counsel.

74

There is no merit to Thompkins's argument that the "green light" testimony violated *Crawford*, *supra*, 541 U.S. 36, for there is no basis for believing Nelson repeated *testimonial* hearsay. On cross-examination, Nelson testified the "green light" threat was made by one of the men who beat him up. Nothing in that scenario suggests the out-of-court speaker, most likely a gang member, would have intended his statement to be preserved for later use at trial, and no evidence suggests it was accompanied by solemnity or formality. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 688, 693-694; *People v. Dungo* (2012) 55 Cal.4th 608, 619; *People v. Leon, supra,* 243 Cal.App.4th at p. 1019.) Moreover, "there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes." (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6.) "The admission of nonhearsay statements 'raises no Confrontation Clause concerns.' " (*People v. Fayed* (Apr. 2, 2020, No. S198132) ___Cal.5th___ [2020 Cal. Lexis 2090, at p. *26].)

### c. Admission of the Testimony Without a Limiting Instruction Was Not Prejudicial

Nor was the admission of the testimony without a limiting instruction prejudicial. (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1054 [failure to give limiting instruction on gang-related evidence was harmless when it "would not have significantly aided defendants under these facts or weakened the strength of the evidence of guilt the jury properly could have considered"].) Although the "green light" testimony no doubt had a potential prejudicial impact, it also was highly probative of the reason for Nelson's reluctance to come forward, which in turn reflected on his credibility, a pivotal issue in the trial. Given the overall negative portrayal of Thompkins through admissible evidence, the jury's view into the sinister world of gang culture, and the prosecutor's restrictive use of the "green light" evidence, we see no reasonable probability the outcome would have been better for Thompkins if a limiting instruction had been given. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## C. ADDITIONAL INSTRUCTIONAL ISSUES[*]

### 1. Voluntary Manslaughter and Attempted Voluntary Manslaughter Instructions

*a. The Parties' Positions*

Both Thompkins and Fox contend on appeal that the judge should have given instructions on voluntary manslaughter and attempted voluntary manslaughter as lesser included offenses. Thompkins's counsel requested voluntary manslaughter instructions based on heat of passion and imperfect defense of another, that is, the gunman fired in the unreasonable but actual belief in the need to defend others. (CALJIC No. 8.40.) The trial court denied the requests for manslaughter instructions and instructed the jury only on first and second degree murder.[28]

The court must give a requested instruction "only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) Even without a request, a "trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) In either case, " 'unsupported theories should not be presented to the jury.' " (*Marshall*, *supra*, at p. 40.) We independently review whether substantial evidence supported the giving of an instruction. (*Simon, supra,* at p. 133; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

---

[*] See footnote, *ante*, page 1.

[28] We see nothing in the record indicating Fox's attorney joined in the request for manslaughter instructions. Both defendants claim the evidence so clearly raised the possibility that the crimes were manslaughter rather than murder that the court was required to instruct on voluntary manslaughter and attempted voluntary manslaughter sua sponte. We necessarily reject that argument in upholding the judge's refusal of the requested instructions.

*b. Heat of Passion*

Heat of passion reduces an intentional killing to manslaughter because the law recognizes that intense emotion in response to sufficient provocation sometimes overcomes reason so completely that a defendant should not be held fully accountable for his reactions. (See *People v. Nelson* (2016) 1 Cal.5th 513, 539; *People v. Bryant* (2013) 56 Cal.4th 959, 968; *People v. Beltran* (2013) 56 Cal.4th 935, 942; *People v. Avila* (2009) 46 Cal.4th 680, 705.) In such circumstances, we say malice, even though present, has been "negated" by overriding passion. (*Bryant*, *supra*, at p. 968; *Avila*, *supra*, at p. 705.)

Fox does not argue a heat of passion theory required instruction on voluntary manslaughter, but Thompkins does. Thompkins contends heat of passion instructions should have been given because the jury could have found *Fox* was the shooter, and if so, *Fox* may have acted in the heat of passion aroused during the jostling at the front door of the restaurant. If Fox was the shooter, Thompkins argues, there was only a 30- to 45-second time lapse from arousal of the passion to execution of the murders, which Thompkins claims was an insufficient cooling off period. (See *People v. Beltran*, *supra*, 56 Cal.4th at p. 951; *People v. Moye* (2009) 47 Cal.4th 537, 550; CALJIC No. 8.43.) And if Fox acted in the heat of passion, then Thompkins, too, as an accomplice, would have been guilty only of voluntary manslaughter. We reject Thompkins's analysis.

As Thompkins seems to recognize, his heat of passion theory would work only if the jury concluded the first man in dreadlocks was also the shooter. If, as the consolidated information charged and the prosecutor urged, the man who got into a conflict with the crowd and the shooter were two different people,[29] the heat of passion argument would evaporate. The heightened emotion of the combatant at the front door would not mitigate the malice harbored by the driver as shooter.

_____

[29] Though Sims and Baskin thought the first man with dreadlocks and the shooter might be the same man (and Thompkins was that man), the weight of the evidence was to the contrary. Ward, Ford and Stemley (and, of course, Nelson) all testified the shooter was a different man.

Thompkins's argument that the instruction should have been given is directly linked to his theory that Fox might have been the shooter.[30] To the extent Thompkins encourages us to draw upon Fox's postsentencing confession, he does so fruitlessly. That testimony did not come before the jury and cannot be used in assessing trial errors. In fact, there was no substantial evidence at trial that Fox was the shooter. None of the bar patrons identified him, Thompkins named him in his statement to the police, but that was not in evidence. And Nelson had retracted and explained his initial accusation that Fox was the shooter. Even supposing that, at the time instructional issues were decided, the evidence could have supported a factual finding that Fox was the shooter, the omission of such instruction was not prejudicial.

Supposing Fox to be the shooter runs counter to the whole theory of the case as charged, as tried, and as the jury found the facts to be. The evidence consistently showed there was only one shooter. Thompkins was charged solely as the shooter and Fox solely as an aider and abettor. The prosecutor argued Thompkins was the shooter and Fox the nonshooter. The verdict forms left no option of finding the firearm discharge enhancement against Thompkins true on a theory that a *principal* discharged a firearm. The verdicts show the jury believed Thompkins was the shooter. And, of course, the proceedings in the superior court on Thompkins's first habeas petition (A147135) reaffirmed the jury's finding that Thompkins was the shooter.

Even if, hypothetically, the jurors could have determined Fox was the shooter as a factual matter, they would have then found the personal firearm use and personal discharge enhancements not true with respect to Thompkins. The jury's findings against Thompkins on those enhancements render any instructional error harmless. A heat of passion instruction would not have changed the jury's decision about who fired the

---

[30] Thompkins expressly limits his contention to the factual scenario in which *Fox* could have been found to be the shooter and also the man engaged in the tussle at the door. Therefore, we do not address whether a heat of passion instruction might have been necessary on the theory that *Thompkins* might have been the man engaged in the conflict in the entryway.

weapon. Therefore, no more favorable verdict for Thompkins would have been rendered, even if heat of passion instructions had been given for Fox's benefit. Judge Nakahara, when the case was returned to him on an order to show cause on Thompkins's first habeas petition (A147135), found Thompkins was adjudicated by the jury to be the shooter, and Fox's statement to the contrary was not credible. Judge Nakahara further ruled that Tyree James's declaration was not admissible as a declaration against penal interest (Evid. Code, § 1230) and was in any case not credible.

We accept the credibility determinations made by the judge who oversaw both the trial and the habeas evidentiary hearing. "The main reason for an evidentiary hearing is to have the referee determine the credibility of the testimony given at the hearing. [Citation.] Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings and 'give great weight' to them when supported by substantial evidence." (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333; see also *In re Hardy* (2007) 41 Cal.4th 977, 993 ["This is especially true for findings involving credibility determinations. . . . [W]e give special deference to the referee on factual questions 'requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying.' "].) We follow the same practice here. On credibility especially we defer to the trial judge. "A trial court's credibility finding will be sustained so long as the account is plausible." (*People v. Molano* (2019) 7 Cal.5th 620, 657.)

### c. Imperfect Defense of Others

#### i. The Law

Both defendants argue they were entitled to voluntary manslaughter instructions based on imperfect defense of others. They treat Thompkins as the shooter, but argue Thompkins was acting to protect Fox when he fired the fatal shots. Actual self-defense or defense of another is a complete defense to a charge of murder or attempted murder and, if believed, results in acquittal. (*People v. Elmore* (2014) 59 Cal.4th 121, 133-135; CALJIC Nos. 5.12, 5.13, 5.14, 5.30, 5.32.) But that rule applies only when the belief in

the need for self-defense or defense of others is objectively reasonable. (*Elmore*, at pp. 133-134; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Hardin* (2000) 85 Cal.App.4th 625, 629; CALJIC Nos. 5.12, 5.32, 5.51.) When a homicide is committed while acting under an honestly held but objectively unreasonable belief in the need for self-defense—sometimes called "imperfect self-defense"—the crime is voluntary manslaughter. (*Elmore*, at p. 134; *People v. Duff, supra,* 58 Cal.4th at p. 561; CALJIC Nos. 5.17, 8.41.) The same principles extend to an actual but unreasonable belief in the need to defend others. (*People v. Randle* (2005) 35 Cal.4th 987, 993-996 (*Randle*); CALJIC No. 5.17.)

Imperfect defense of others requires the defendant to have perceived the threat to those protected to be an "imminent" threat of "death or great bodily injury." (*Randle*, *supra*, 35 Cal.4th at p. 997.) " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 270-271 (*Trujeque*).) The availability of the defense is tested from the defendant's perspective. (*Id*. at p. 271.) Because "[i]mperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter . . . [citations], [i]t follows that voluntary manslaughter arising from imperfect defense of another is a lesser included offense of the crime of murder. [Citations.] If supported by substantial evidence, a trial court has the duty to instruct on a lesser included offense. [Citation.] 'The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense.' " (*Ibid.*)

Imperfect defense of others is not an open-ended license to kill indiscriminately. It calls for a degree of proportionality. The doctrines of self-defense and defense of others are limited to situations in which the defendant acted reasonably and with a measured response no greater than necessary to repel the attack. (See *People v. Hardin*, *supra*, 85 Cal.App.4th at pp. 629-630; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 271-274; *People v. Clark* (1982) 130 Cal.App.3d 371, 377, 380; CALJIC Nos. 5.52, 5.53,

80

5.54, 5.55.)  On appeal, it is ultimately up to us to determine, reviewing the record independently, whether the evidence supports the giving of an imperfect self-defense or defense of another instruction.  (*Trujeque*, *supra*, 61 Cal.4th at p. 271.)

### ii. The Evidence Regarding the Scuffle At the Door

Neither imminence nor gravity of threatened harm was shown by the evidence of the tussle at the door to Sweet Jimmie's.  The testimony about the interaction did not portray Fox as being in danger of great bodily injury or death, such that response with an assault rifle could be justified.  (See CALJIC No. 5.31; see also CALCRIM Nos. 571, 3470; CALJIC Nos. 5.17, 8.40, 8.41.)  Not only would a reasonable person not have perceived the shoving match as a serious threat to Fox, but there is no evidence Thompkins himself "*actually . . .* believed [Fox] was in imminent danger of death or great bodily injury."  (*In re Christian S.* (1994) 7 Cal.4th 768, 771; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [defendant claiming self-defense must " ' "prove his own frame of mind" ' "]; *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 745; *People v. Uriarte* (1990) 223 Cal.App.3d 192, 198 [recognizing unreasonable defense of others but holding it inapplicable due to defendant's failure to present evidence of his subjective fear for his wife's safety].)  Thompkins argues: "The defendant is not required to testify in order to obtain an instruction on imperfect self-defense."  That may be true when there is circumstantial evidence of the defendant's mental state,[31] but no such circumstantial evidence existed in this case.

Even more to the point, Thompkins's reaction was so extreme as to take it out of the realm of lawful defense of another.  Thompkins delivered 10 shots rapid-fire,

---

[31] For instance, *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262-1263, cited by Thompkins, held an imperfect self-defense instruction should have been given even without defendant's testimony to his state of mind, but in that case there was circumstantial evidence that the defendant was in actual fear based on the testimony of other witnesses that someone shot at the defendant before he fired back, the physical evidence showed two guns had been fired, and the defendant had a bullet hole in his jacket showing he had been shot at.  That is a far different circumstance from the one before us.

indiscriminately and without warning, into a roomful of people who posed no reasonably discernible threat to Fox or anyone else. His innocent victims were trapped in the line of fire. This was not defense of others, perfect or imperfect. The only form of homicide rationally supported by the evidence here was murder—indeed, an effort at mass murder with a semiautomatic rifle—not some attempt to come to the aid of an imperiled victim of mob violence. No reasonable jury could have found that Thompkins was merely carrying out an overheated attempt at rescuing the imperiled Fox.

Had the jurors been fully instructed on imperfect defense of others they would have learned that such a defense may not be contrived for purposes of instigating violence. (CALJIC No. 5.55.) An attack with fists will not justify the use of a deadly weapon unless it appears to the defendant that the victim intended to inflict great bodily injury on the defendant or another person protected. (See *People v. Parks* (2004) 118 Cal.App.4th 1, 4, fn. 2; CALJIC No. 5.31.) And in *Randle*, *supra*, 35 Cal.4th at pages 1002-1003, the Supreme Court confirmed there is a wrongful conduct limitation—disallowing the defense where the defendant's own wrongful conduct initiated the physical confrontation—that applies to imperfect defense of others. (See also *People v. Seaton* (2001) 26 Cal.4th 598, 664 [imperfect self-defense]; *People v. Frandsen*, *supra*, 196 Cal.App.4th at pp. 271-274 [initial wrongful conduct in imperfect self-defense]; *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102.)

We find there was no evidence worth considering that Thompkins actually, subjectively believed the "attack" on Fox—by pushing, shoving or surrounding him—put Fox in imminent danger of great bodily injury or death so as to justify Thompkins's response with an assault rifle. Had the jury been supplied with a full complement of instructions on the limits of imperfect defense of others, we see no reason to believe its verdicts would have changed. (*Randle*, *supra*, 35 Cal.4th at p. 1003 [applying *Watson*].)

iii. The Prospect of a Gun Inside Sweet Jimmie's

Fox and Thompkins argue, besides the scuffle at the door, there was evidence of other, more sinister and more threatening harm that was about to befall Fox if Thompkins had not intervened. They suggest someone in the bar, perhaps other than those

interacting with Fox at the door, may have engaged in some provocative and threatening behavior towards their group. They specifically point to evidence that someone in the bar had a gun. We conclude the evidence supporting imperfect defense of others was too thin to call for instruction on voluntary manslaughter.

Baskin, who claimed to have some familiarity with firearms, did testify he heard a small caliber weapon fire during the fracas, as well as a larger caliber rifle. He said the small caliber weapon fired first, and it sounded like the gunshot came from the doorway. No other witness confirmed this auditory observation. Two witnesses did see a smaller caliber handgun in Sweet Jimmie's that night, though. Sims saw a semiautomatic handgun on the floor as she was crawling toward the back of the restaurant. Freeman, another victim of the shooting, saw a man running from the front of the restaurant toward the rear, pointing his gun toward the front door. But neither Sims nor Freeman saw a smaller handgun being fired, and no smaller caliber weapon or shell casings were found at the scene. There was no forensic evidence of a second shooter.

We recognize that imperfect defense of others would depend on Thompkins's subjective belief about the threat to Fox, not whether such a belief was objectively reasonable. (*Trujeque*, *supra*, 61 Cal.4th at p. 271.) But there is no evidence that Thompkins subjectively feared Fox was about to be killed or seriously injured. Neither Fox in his statement to the police nor Nelson in his trial testimony mentioned anything about having seen someone inside the bar threatening them with a weapon. Fox never said he felt in danger; in fact, he suggested he was ready to fight the "nerd niggers" at the entryway to the bar because they were not going to "really do nothing." Fox knew there was a gun in the car, but, he told the police, "there wasn't really no need for that."

Even if someone in the bar had a handgun, imperfect defense of others requires that *Thompkins saw it* and was so alarmed by it that he took immediate action to avert imminent harm to Fox. Not only was such evidence absent from the trial, but it was highly unlikely Thompkins could have seen a weapon pointed by someone at the rear of the bar. Thompkins brought the assault rifle with him when he exited the car and used it

83

without hesitation. He surely could not have seen a weapon inside Sweet Jimmie's while still seated in the car double-parked outside.

Finally, whatever protection imperfect self-defense might afford a killer acting in claimed reliance on it evaporates when the perceived danger "ceases to exist." (CALJIC No. 5.52.) Fox appears to have escaped any threat of harm after he was pushed out of or backed away from the entrance to Sweet Jimmie's. He may have felt humiliated, but there was no evidence he was injured or terrified for his life. By departing the immediate doorway area, he was safe from any attack by the people from the bar. There was no testimony that any of the bar's patrons continued to quarrel with him, pursued him, or threatened him in any way. When Thompkins showed up with the assault rifle, whatever minor conflict had erupted over the neck chain was finished. Thus, Fox was not in "imminent" danger. Imperfect defense of others was not a viable defense on this evidence, and defendants were not entitled to such instruction.

## 2. Thompkins's Claim Regarding Failure to Instruct the Jury that Fox Was Potentially an Accomplice Whose Statement Should Be Viewed with Caution

Juries are routinely instructed to view accomplice testimony incriminating the defendant with caution (CALCRIM No. 300; CALJIC No. 3.18), and the jury in this case was no exception. The Supreme Court has expressed the rule thusly: " ' "*To the extent an accomplice gives testimony that tends to incriminate the defendant*, it should be viewed with caution." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 161, italics added.) We emphasize the italicized words because, so far as the jury knew, no testimony or statement by Fox incriminated Thompkins and, thus, there was no need for a care and caution instruction on Thompkins's behalf. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 217-219; *People v. Williams* (1988) 45 Cal.3d 1268, 1313-1314 [a trial court may instruct the jury that an accomplice's testimony should be viewed with distrust insofar as it tends to incriminate the defendant, but should not be so viewed insofar as it does not]; cf. *People v. Smith* (2017) 12 Cal.App.5th 766, 780 ["Exculpatory testimony, by definition, cannot be said to support a conviction and, thus, need *not* be corroborated."].)

Notably, the trial court *did* give an accomplice testimony "care and caution" instruction,[32] along with a string of others pertaining to accomplice testimony, that made it clear any accomplice's testimony should be viewed with caution insofar as it implicated a defendant in the crime.[33] The court specifically identified Nelson, but not Fox, as a potential accomplice. Giving a cautionary instruction pinpointing Fox's interview statements was unnecessary. The accomplice instructions given prevented any prejudicial misuse of Fox's interview. (See *People v. Lewis* (2001) 26 Cal.4th 334, 371 (*Lewis*) [additional instructions such as those given in this case may suffice in lieu of instructing that accomplice testimony must be viewed with distrust].)

Despite the several general instructions on how accomplice testimony should be viewed (see *ante,* fn. 34), Thompkins contends the court (1) failed to tie the cautionary instruction specifically to Fox as a potential accomplice, and (2) failed to instruct the jury to view Fox's statements to the police—not just Nelson's in court "testimony"—with care and caution. Again, the court *did* instruct that "testimony" includes an out-of-court

_____

[32] On the "care and caution" rule, the jury was instructed: "To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the evidence in this case." (CALJIC No. 3.18.)

[33] The court defined an accomplice (CALJIC No. 3.10), informed the jury of the necessity of corroboration for accomplice testimony (CALJIC No. 3.11), told the jury how to determine whether the corroboration was sufficient (CALJIC No. 3.12), and instructed that an accomplice's testimony is to be viewed with care and caution (CALJIC No. 3.18). The court also specified that the defendants had the burden to prove Nelson was an accomplice for purposes of applying the corroboration and care and caution rules (CALJIC No. 3.19), but it did not give a similar instruction naming Fox as a potential accomplice. The court also told the jury specifically that Fox's statements during the June 29, 2011 interview could not be used as evidence against Thompkins, and the jurors must not speculate about "portions of his statement that [they] did not hear." (CALJIC No. 2.08.)

statement,[34] so the only remaining question is whether the court was obliged to identify Fox specifically as a potential accomplice.[35]  It was not.

The rules relating to accomplice testimony apply also when the testifying accomplice is a codefendant (*Avila*, *supra*, 38 Cal.4th at pp. 561-562), at least upon a defendant's request (*People v. Box* (2000) 23 Cal.4th 1153, 1208-1209; *People v. Smith* (2005) 135 Cal.App.4th 914, 928).  But CALJIC No. 3.19 need not be given in this instance, where the accomplice testimony at issue was Fox's statement to the police that had been redacted under *Aranda/Bruton* so as *not* to incriminate Thompkins.  The care and caution instruction tends to contradict (to Thompkins's prejudice) the judge's instruction that Fox's statement could not be used as evidence against Thompkins at all (CALJIC No. 2.08), a point emphasized by the district attorney in closing argument. CALJIC No. 3.19, which we regard as a pinpoint instruction, would have been especially confusing because Fox's redacted statement did not on its face tend to incriminate Thompkins.  We perceive no error in the court's failure to give further instruction on this

---

[34]  The jury was instructed, "Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated out of court was true."  (CALJIC No. 3.11.)  Thompkins also criticizes another alleged omission, arguing, "The sine qua non of adequate corroboration is that it must 'tend to connect the defendant with the commission of the offense.' " (Underscoring omitted.)  But the jury was instructed: "To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged."  (CALJIC No. 3.12.)  We fail to see why these instructions were insufficient.

[35] CALJIC No. 3.19, as given to the jurors, told them: "You must determine whether the witness, Christopher Nelson, was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Christopher Nelson was an accomplice in the crimes charged against the defendant." Thompkins seems to contend a similar instruction should have been given substituting Fox's name for Nelson's.  Thompkins's trial counsel suggested the jury should be allowed to consider codefendant Fox an accomplice, but he did not request that CALJIC No. 3.19 be given using Fox's name.

86

issue, especially because there was no specific request for the instruction[36] and the jury would have been naturally skeptical of any attempt by Fox to shift blame from himself simply because of his role in the crime.[37] (See *Lewis*, *supra*, 26 Cal.4th at p. 371 [omission of "care and caution" instruction harmless where "[a]ny reasonable juror would reach this conclusion without instruction"].)

Moreover, any error in omitting such an instruction is deemed harmless if there was sufficient corroboration. (*Lewis*, *supra*, 26 Cal.4th at p. 370.) Here, presuming the inculpatory implication from Fox's statement was that Thompkins had control of the gun in the car while Fox was arguing with the patrons of Sweet Jimmie's, Sims's and Baskin's identifications of Thompkins as the shooter provided ample independent corroborating evidence. Ford saw the driver exit the car carrying the rifle. Any instructional error on this point was harmless. (See *Avila*, *supra*, 38 Cal.4th at p. 562 [*Watson* applies].)

### 3. Fox Was Not Entitled to Instruction on Voluntary Intoxication

In a supplemental brief, Fox claims he was erroneously denied an instruction on voluntary intoxication. The record shows the People initially listed instructions on voluntary intoxication in their proposed jury instructions with the annotation "to discuss." Later, Fox's counsel requested such instruction.

---

[36] Although Thompkins's counsel suggested Fox was potentially an accomplice, he did not expressly request CALJIC No. 3.19 designating Fox as such. Ordinarily, a pinpoint instruction is not required in the absence of a request. (E.g., *Covarrubias*, *supra*, 1 Cal.5th at pp. 873-874.)

[37] The jurors already knew Fox could be an accomplice because he was charged as an accomplice. The jurors were given aiding and abetting instructions and accomplice-as-witness instructions to guide them to conclude Fox was an accomplice and thus to apply the accomplice-as-witness rules to Fox's statement to the police, if they found any part of it incriminating as to Thompkins. Since Fox made no facially incriminating statements about Thompkins on the redacted DVD, however, for the court to lead them on this path would have undermined the instruction that they were not to speculate about the portions of Fox's interview that had been edited out of the DVD.

87

Nelson testified that before the shooting he and the others had spent the day driving around Oakland and drinking. Nelson was "loaded," but not to the point where he had problems with perception or decisionmaking. He did say he drank "a gallon" of gin and juice, and he told the police he was intoxicated to the point of not remembering all the details of the events. Nelson testified Fox was "drunk," but he was not asked to elaborate and did not.

In his interview with Lt. Jones, Fox described himself as "drunk." He said he had been drinking Patrón tequila, Seagram's gin, another brand of tequila, and Hennessey. Nevertheless, he described in detail his activities in the period immediately before, during and after the shooting. The only detail that he claimed to be too drunk to recall was the time at which the group first pulled up to Nation's.

Fox's trial counsel asked the court to instruct the jury on voluntary intoxication using CALJIC No. 4.21.1.[38] She argued that Fox told the police he was drunk. The trial court stated, "The issue is whether that's substantial evidence of intoxication or not." Fox's trial counsel responded, "It's only his word at this point, your Honor. I don't believe any witness testified to Mr. Fox's state of sobriety." The trial court declined to give the instruction. We review that ruling de novo. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584; *People v. Waidla*, *supra*, 22 Cal.4th at p. 733.)

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with

---

[38] CALJIC No. 4.21.1 provides: "It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. [¶] Thus, in the crime[s] of charged in Count[s] ____, [or the crime of which is lesser thereto,] the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime. This rule applies in this case only to the crime[s] of [_____.] [, and the lesser crime[s] of _____.] [¶] However, there is an exception to this general rule, namely, where a [specific intent] [or] [mental state] is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required [specific intent] [or] [mental state] at the time of the commission of the alleged crime."

murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b); *People v. Horton* (1995) 11 Cal.4th 1068, 1119; see generally, *People v. Timms* (2007) 151 Cal.App.4th 1292, 1296-1298.) A defendant is entitled to an instruction on voluntary intoxication "only when there is substantial evidence of the defendant's voluntary intoxication *and the intoxication affected the defendant's 'actual formation of specific intent.'* " (*People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*), italics added; see also *Horton*, *supra,* at p. 1119; *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1662 [no instruction necessary where "neither the defendant nor any other witness testified that the drinking had noticeably affected the defendant's mental state or actions"].)

We agree the jury was required to make multiple findings of specific intent in this case but disagree with the rest of Fox's analysis. There was no evidence that Fox was so intoxicated he could not form the intent required in the various charges and enhancements for which he was on trial. And there was convincing evidence to the contrary.

This case is comparable to *Williams*, *supra*, 16 Cal.4th 635, where the Supreme Court held a witness's testimony that the defendant was "probably spaced out" on the morning of the killings, together with defendant's comments in a police interview that he was "doped up" and "smokin' pretty tough," provided "scant" evidence of voluntary intoxication and, considering the lack of evidence the drugs "had any effect on defendant's ability to formulate intent," such evidence did not qualify as "substantial" for purposes of requiring instruction on voluntary intoxication. (*Id*. at pp. 677-678.)

Indeed, courts have frequently found instruction on voluntary intoxication unnecessary when there was self-reporting of intoxication but no indication that mental functioning was impaired. (See *People v. Ramirez* (1990) 50 Cal.3d 1158, 1180-1181 [defendant testified he was drunk but gave a detailed account of the events and did not suggest his drinking affected his memory or conduct]; *People v. Ivans*, *supra*, 2 Cal.App.4th at p. 1662 [defendant testified he was high on speed but gave a detailed account of the events]; *People v. Simpson* (1987) 192 Cal.App.3d 1360, 1369-1370

[defendant had been "drinking for several hours" and was "woozy" but recalled the events]; *People v. Harris* (1981) 28 Cal.3d 935, 958 [defendant told police, "I was pretty loaded and I didn't know what I was doing"]; *People v. Spencer* (1963) 60 Cal.2d 64, 88 ["pretty well plastered"].)

Nelson described Fox as "drunk," and Fox described himself the same way. Fox said in his redacted June 29 interview he was too drunk to remember the exact time the party of four arrived at Nation's. That was the sum and substance of testimony about his state of intoxication. Neither Nelson nor any other witness described any behavior that would lead one to believe Fox was unable to form a specific intent. There was no expert testimony to substantiate a diminished actuality defense, and not even any evidence Fox was stumbling, slurred his speech, vomited, or was mentally confused. As in *Williams*, there was no evidence that Fox's state of insobriety affected his ability to form a specific intent. (*Williams*, *supra*, 16 Cal.4th at pp. 677-678.) Without such evidence, the court was not required to give the instruction.

In fact, the evidence established that Fox was able to and did entertain goal-directed thoughts and formed the intention to carry out identified actions despite his drinking. He described going to East Oakland to get his assault rifle and returning downtown "looking for the Acorn niggers." Considering the strong evidence that Fox actually formulated the intent to participate in a murder—which the jury found convincing beyond a reasonable doubt—the trial court properly denied the requested instruction on voluntary intoxication. There was, in any event, no reasonable probability the outcome of the trial would have been better for Fox if a voluntary intoxication instruction had been given. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135 [*Watson* applies]; *People v. Rivera* (1984) 162 Cal.App.3d 141, 146 [same].)

**1. The Penalties for the Gang Enhancements on Fox's Attempted Murder Convictions Were Unauthorized Under Section 12022.53, Subdivision (e)(2)**

Fox correctly argues the gang enhancements imposed on him on the attempted murder counts were imposed in error. The provision allowing an accomplice to a gang-related crime to be sentenced as harshly as the shooter is subdivision (e)(1) of section 12022.53: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22 [and] [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)." Immediately thereafter, subdivision (e)(2) of section 12022.53 provides: "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." Fox was not found to have personally used or discharged a firearm. The Attorney General agrees the gang enhancement (§ 186.22, subd. (b)(1)(C)) cannot lawfully be imposed on counts 3 through 7 against Fox in addition to the 25-to-life firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).

Because we reverse counts 3 through 7 for error in giving the kill zone instruction, no immediate action by the court below is necessary upon remand. If, however, the charges are retried, the court should take care not to repeat this sentencing error if Fox is again convicted on any of counts 3 through 7.

**2. Claimed Error in Imposing the Great Bodily Injury Enhancement on Count 7**

Defendants initially claimed the evidence was insufficient to support the true finding of great bodily injury to Sims's friend Lee under section 12022.7, subdivision (a) and 12022.53, subdivision (d), who was the least seriously injured of the Sweet Jimmie's victims, having only been grazed by a bullet on her calf. Arguing that her injury was too

---

[*] See footnote, *ante*, page 1.

minor to support a great bodily injury finding, defendants claimed the 25-to-life enhancement on count 7 should be vacated. We need not address this issue because we are reversing the conviction on count 7 altogether and the enhancement with it.

**3. Fox's Confession at Sentencing as it Allegedly Affects Thompkins's Convictions**

Thompkins argues both on appeal and in his first habeas petition (A147135) that he should have had a hearing on a motion for a new trial based on Fox's post-sentencing testimony as newly discovered evidence, and he did not receive one, in part due to his attorney's failure to take the proper procedural steps. In this appeal, we discuss only Fox's statements and testimony at sentencing, not the additional matter alleged in Thompkins's habeas petitions.[39]

Thompkins argues he is entitled to a new trial because, if the trial court had recalled his sentence, either on its own motion or on Thompkins's motion, Thompkins's attorney could have made a new trial motion, which was destined to succeed. Besides faulting the court for failing to recall the sentence on its own motion, Thompkins argues his trial attorney was ineffective under the Sixth Amendment for failing to make such a motion under section 1170, subdivision (d).

The Attorney General agrees that Thompkins's attorney could have made a motion for the trial court to recall its sentence, at which point he could have made a motion for a new trial, citing *Dix v. Superior Court* (1991) 53 Cal.3d 442, 455, 460 and *Portillo v. Superior Court* (1992) 10 Cal.App.4th 1829, 1834-1836 (*Portillo*). He therefore addresses the issue as ineffective assistance of counsel and concludes a new trial motion

---

[39] In the first habeas petition (A147135) Thompkins presented additional evidence that Fox was the shooter in the form of a declaration by James, the fourth man in the white Toyota. Thompkins also raised a claim of ineffective assistance of counsel because his trial attorney allegedly did not investigate James as a potential witness. Those issues were dealt with on habeas corpus. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.) We issued an order to show cause returnable before the trial court, which held an evidentiary hearing and denied the habeas petition.

The second habeas petition (A158110) is currently pending before this court. It has not been consolidated with the appeal. It will be disposed of by separate order.

92

would not have been successful because Fox's testimony was not credible enough to warrant granting a new trial motion; hence, he argues, Thompkins has not shown prejudice under *Strickland v. Washington, supra,* 466 U.S. at page 687.

We agree with the Attorney General. Even assuming Thompkins's counsel could have—and should have—filed a memorandum urging the trial court to exercise in Thompkins's favor its virtually unfettered discretion to recall Thompkins's sentence (§ 1170, subd. (d); *Dix v. Superior Court*, *supra*, 53 Cal.3d at p. 456), it is unlikely to have changed anything. We presume the court was already aware of its authority (Evid. Code, § 664) and made a conscious choice not to exercise it.

Even assuming the court would have granted the request, the problem remains that a new trial motion on the basis of Fox's testimony was doomed to fail. This is especially clear now, since Thompkins has had an evidentiary hearing on his habeas petition (A141375), and Judge Nakahara has determined Fox's testimony to have been incredible and in conflict with the physical evidence. We can therefore say with confidence there is no reasonable likelihood an outcome more favorable to Thompkins would have ensued if his attorney had made a motion to recall his sentence. A new trial motion would have failed for the same reasons that Thompkins's habeas petition failed. Thompkins has filed a second habeas petition (A158110) claiming error in Judge Nakahara's conduct of the first habeas hearing. Those issues will be dealt with in connection with the second habeas petition. Thompkins is not entitled to relief on appeal.

### E. FOX'S CLAIMS OF CLERICAL ERROR[*]

Fox argues his abstract of judgment shows he was sentenced to LWOP on both counts one and two. Comparing the transcript of his sentencing and the abstract of judgment, he frames this as clerical error. The Attorney General is silent on the point. We agree that there was an error here. The court did say, "So as to count one and two, it's going to be life in prison without the possibility of parole plus 50 years to life for the 12022.53(d) clauses and then two years on the prison prior[s]." A special circumstance

---

[*] See footnote, *ante*, page 1.

LWOP penalty should not have been imposed on count 1. The special circumstance was only alleged with respect to count 2, and the jury's finding only applied to count 2. Nor could the court lawfully have imposed the LWOP sentence on both counts because the special circumstance defined by section 190.2, subdivision (a)(3) applies only once in a multiple murder case. (*People v. Danks* (2004) 32 Cal.4th 269, 315 ["Section 190.2, subdivision (a)(3) does not permit a separate multiple-murder special circumstance to be attached to each murder conviction sustained in the capital case because such duplicative use of multiple murder special circumstances 'artificially inflates the seriousness of the defendant's conduct.' "]; see also *People v. Halvorsen* (2007) 42 Cal.4th 379, 422; *People v. Jones* (1991) 53 Cal.3d 1115, 1148-1149.) While the trial court's recitation of the terms of sentence is somewhat ambiguous, we conclude that the duplicative imposition of special circumstances was judicial error, not clerical error. We shall therefore vacate the LWOP sentence as to count 1 and order that, following resentencing, LWOP shall be imposed only on count two, with the abstract of judgment to reflect the correction.[40]

Thompkins's abstract of judgment is similarly flawed. Though he did not raise any issue with respect to the correctness of the abstract or the imposition of two LWOP sentences, the abstract of judgment shows a special-circumstance penalty was imposed on both counts 1 and 2, and the reporter's transcript supports the conclusion that two LWOP sentences were imposed. Because such a sentence is unauthorized, for him too we shall vacate the LWOP sentence on count 1 and direct that, as with Fox's sentence on counts 1 and 2, LWOP be imposed only as to count 2, with the abstract of judgment to reflect the correction.

---

[40] Fox also calls our attention to what is, in fact, a clerical error on the abstract of judgment in that the wrong attorney was named as Fox's counsel. Darryl Billups is named, but Fox's attorney was Debra Levy. Fox further points out that the minute order reflecting Fox's sentencing on April 22, 2014, indicates a two-year term was imposed for the prison prior on counts 1 and 2, when only one year per prior was actually authorized or imposed (§ 667.5, former subd. (b)). The clerk should take care to eliminate such errors on the new abstract of judgment and any attachments prepared after remand.

94

## F. CUMULATIVE PREJUDICE[*]

Finally, both defendants ask us to consider cumulatively the prejudicial impact of the various alleged errors. When multiple errors occur in a trial, though individually harmless, in cumulative effect they may be sufficiently prejudicial to violate due process. (*People v. Hill* (1998) 17 Cal.4th 800, 844; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 (dis. opn. of Mosk, J.).) We found numerous errors in this case, but we have taken sufficient care to cure the harm of each reversible error individually, while concluding the remainder were harmless. Because none of the harmlessness determinations was particularly close, little remains to cumulate. We now reach the conclusion that no further relief is warranted, even considering the cumulative impact of all identified errors. Even considered cumulatively, these errors do not add up to a due process violation.

## IV. DISPOSITION

The judgment is partially reversed and partially affirmed.

The judgment on counts 1 and 2 is reversed, and the matter is remanded solely for resentencing as to both defendants, specifically to allow the judge to exercise his discretion on whether to impose or strike the firearm enhancements found true with respect to counts 1 and 2. (§ 12022.53, subd. (h).) The special circumstance finding, as a matter of law, applies only to count 2. The judge may impose, and the abstract of judgment prepared after resentencing must reflect, a special circumstance finding only on count 2.

The judgment on counts 3 through 7 and related enhancement findings are reversed as to both defendants due to error in giving a kill zone instruction, and the flaw in the instruction itself. Upon remand, the People may retry counts 3 through 7 and related enhancement allegations if the district attorney so elects. The judgment against Fox was also in error in that it imposed gang enhancements (§ 186.22, subd. (b)(1)(C)) on counts 3 through 7, together with firearm enhancements (§ 12022.53, subds. (b), (c) & (d)). The gang enhancements were unauthorized. (§ 12022.53, subd. (e)(2).) The court

---

[*] See footnote, *ante*, page 1.

95

must not repeat this error if those counts are retried and Fox is again convicted, even if the gang allegations are found true.

In all other respects the judgment is affirmed, including the judgment on count 8.

The trial court shall prepare an amended abstract of judgment for each defendant to reflect the sentences imposed on remand or after any additional trial proceedings.  The amended abstracts shall correct the errors identified, *ante*, at page 94 of this opinion, footnote 40.  The trial court is directed to forward certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.


                                        STREETER, J.

I CONCUR:

TUCHER, J.

POLLAK, P.J. — I concur in the lead opinion with one reservation. I see no reason to address the conflict between *People v. Ochoa* (2017) 7 Cal.App.5th 575 and *People v. Blessett* (2018) 22 Cal.App.5th 903, review granted August 8, 2018, S249250, disapproved on other grounds in *People v. Perez* (2020) 9 Cal.5th 1, as the lead opinion does in part A.4.f.ii of the Discussion. There is no reason to decide whether testimony by a gang expert about predicate offenses by gang members should be considered admissible background information or inadmissible case-specific hearsay because, as the majority opinion goes on to hold, there is substantial nonhearsay or hearsay excepted evidence of the predicate offenses in this case. Even if the hearsay concerning predicate offenses should not have been admitted, any possible error was harmless, as the lead opinion also holds. Considerable logic supports the conflicting views in both *Ochoa* and *Blessett.* It will be for the Supreme Court to resolve the conflict.

POLLAK, P. J.

1

| | |
|---|---|
| Trial court: | Alameda County Superior Court |
| Trial judge: | Honorable Vernon K. Nakahara |
| Counsel for plaintiff and respondent: | Xavier Becerra Attorney General of California, Lance E. Winters Chief Assistant Attorney General, Jeffrey M. Laurence Senior Assistant Attorney General, Catherine A. Rivlin Supervising Deputy Attorney General, Bruce M. Slavin Deputy Attorney General. |
| Counsel for defendant and appellant Clem Thompkins: | Stephen B. Bedrick, under appointment by the Court of Appeal. |
| Counsel for defendant and appellant Lamar Fox: | Neil Jacob Rosenbaum, under appointment by the Court of Appeal. |

A141375

1